UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **Faculty, Alumni, and Students Opposed to Racial Preferences (FASORP)**, <br><br> Plaintiff, <br><br> v. <br><br> **Northwestern University**; **Hari Osofsky**, in her official capacity as dean of Northwestern University School of Law, **Sarah Lawsky**, **Janice Nadler**, and **Daniel Rodriguez**, in their official capacities as professors of law at Northwestern University; **Dheven Unni**, in his official capacity as editor in chief of the Northwestern University Law Review; **Jazmyne Denman**, in her official capacity as senior equity and inclusion editor of the Northwestern University Law Review, <br><br> Defendants. | Case No. 1:25-cv-01129 |

## COMPLAINT

Faculty hiring at American universities is a cesspool of corruption and lawlessness. For decades, left-wing faculty and administrators have been thumbing their noses at federal anti-discrimination statutes and openly discriminating on account of race and sex when appointing professors. They do this by hiring women and racial minorities with mediocre and undistinguished records over white men who have better credentials, better scholarship, and better teaching ability. This practice, long known as "affirmative action," is firmly entrenched at institutions of higher learning and aggres-

sively pushed by leftist ideologues on faculty-appointment committees and in university DEI offices. But it is prohibited by federal law, which bans universities that accept federal funds from discriminating on account of race or sex in their hiring decisions. *See* 42 U.S.C. § 2000d (Title VI); 42 U.S.C. § 2000e-2 (Title VII); 20 U.S.C. § 1681 (Title IX); *see also* 42 U.S.C. § 1981 (prohibiting racial discrimination in the making and enforcement of contracts).

University faculty and administrators think they can flout these anti-discrimination statutes with impunity because they are rarely sued over their discriminatory hiring practices and the Department of Education looks the other way. But now the jig is up. The Supreme Court is no longer willing to indulge affirmative-action exceptions to the unambiguous textual commands of Title VI, Title VII, Title IX, and 42 U.S.C. § 1981. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181, 206 (2023). And plaintiff FASORP has organizational standing to sue any university that refuses to adopt colorblind and sex-neutral faculty-hiring practices. FASORP brings suit to enjoin Northwestern's discriminatory faculty-hiring practices and expose the corrupt faculty and administrators who enable and perpetuate these violations of federal law.

## JURISDICTION AND VENUE

1. The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

2. Venue is proper because a substantial part of the events giving rise to the claims occurred in this judicial district. *See* 28 U.S.C. § 1391(b)(2).

## PARTIES

3. Plaintiff Faculty, Alumni, and Students Opposed to Racial Preferences (FASORP) is a voluntary, unincorporated, non-profit membership organization formed for the purpose of restoring meritocracy in academia and fighting race and sex

preferences that subordinate academic merit to so-called diversity considerations. FASORP has members who are ready and able to apply for entry-level and lateral faculty positions at Northwestern University's law school. FASORP's website is at https://www.fasorp.org.

4. Defendant Northwestern University is a non-profit educational institution organized under the laws of the state of Illinois. It can be served at its Office of the General Counsel, 633 Clark Street, Evanston, Illinois 60208.

5. Defendant Hari M. Osofsky is dean of the Northwestern University School of Law. She can be served at 375 East Chicago Avenue, Chicago, Illinois 60611-3069. She is sued in her official capacity as dean.

6. Defendant Sarah Lawsky is a professor of law at Northwestern University. She can be served at 375 East Chicago Avenue, Chicago, Illinois 60611-3069. She is sued in her official capacity.

7. Defendant Janice Nadler is a professor of law at Northwestern University. She can be served at 375 East Chicago Avenue, Chicago, Illinois 60611-3069. She is sued in her official capacity.

8. Defendant Daniel Rodriguez is a professor of law and former dean of the law school at Northwestern University. He can be served at 375 East Chicago Avenue, Chicago, Illinois 60611-3069. He is sued in his official capacity.

9. Defendant Dheven Unni is editor in chief of the Northwestern University Law Review. He is sued in his official capacity as editor in chief.

10. Defendant Jazmyne Denman is senior equity and inclusion editor of the Northwestern University Law Review. She is sued in her official capacity as senior equity and inclusion editor.

# BACKGROUND

## I. Northwestern's Use of Race and Sex Preferences In Faculty Hiring

11.   For at least the last twelve years, since the installation of then-Dean Daniel Rodriguez, the leadership of Northwestern Law School has propagated and enforced a mandate to hire as many non-white and non-male faculty candidates as possible.

12.   This hiring mandate, which remains in effect, directs Northwestern Law School to intentionally and consciously discriminate in favor of black, Hispanic, Asian, female, homosexual, and transgender faculty candidates, and against white men who are heterosexual and non-transgender. Candidates with preferred identities are awarded substantial advantages and chosen over white men who have vastly superior publication records and far more impressive educational and professional credentials.

13.   Dean Rodriguez knew that this discriminatory hiring edict was illegal and would expose the university to lawsuits. So he ordered the Northwestern faculty to never discuss candidates for hiring over the faculty listserv, and explicitly mentioned litigation risk as his reason for banning listserv discussions of faculty candidates. Rodriguez's successors as dean, including Kimberly Yuracko and Hari M. Osofsky, have continued his policy of banning listserv discussions of faculty candidates.

14.   As a result of the mandate, Northwestern University School of Law refuses to even consider hiring white male faculty candidates with stellar credentials, while it eagerly hires candidates with mediocre and undistinguished records who check the proper diversity boxes.

15.   Eugene Volokh is a prolific and internationally renowned legal scholar whose academic works, especially on the First Amendment, are often cited by litigants, courts, and scholars. He served as a law professor at UCLA for 30 years. He is a member of the American Law Institute, a co-founder of one of the most popular legal blogs in the world, and his work has been repeatedly cited by the Supreme Court of the United States. He is also a former law clerk for Justice Sandra Day O'Connor. By

any measurement concerned with academic merit rather than diversity considerations, Professor Volokh would be a highly desirable and sought-after faculty candidate at any law school. His accomplishments exceed those of nearly every professor currently on the Northwestern Law School faculty. Professor Volokh, however, is a white man, and he is neither homosexual nor transgender.[1]

16.    During the 2022–2023 academic year, Professor Volokh contacted Northwestern Law School to express his interest in working there and asked to be considered for an appointment. This is customary practice for applying for a lateral faculty appointment at Northwestern Law School. The idea of appointing Professor Volokh was supported by many of Northwestern's public-law faculty. But the appointments committee that year was chaired by former dean Dan Rodriguez, who repeatedly pushed for race-based hirings as dean and refused to even invite Professor Volokh to interview. Because of Rodriguez's intransigence, Professor Volokh's candidacy was never even presented to the Northwestern faculty for a vote, while candidates with mediocre and undistinguished records were interviewed and received offers because of their preferred demographic characteristics.

17.    Rodriguez's opposition to Professor Volokh had nothing to do with Volokh's merit as a scholar or teacher. Rodriguez opposed Professor Volokh and blocked consideration of his candidacy because Professor Volokh is a white man, and Rodriguez wants to appoint women, racial minorities, homosexuals, or transgender people to the Northwestern faculty—even when they are far less capable and far less accomplished than a white male candidate such as Professor Volokh. Numerous professors at Northwestern, including the current Vice Dean Emily Kadens, openly said that Professor Volokh would have been hired at Northwestern had he been anything other than a white man.

---

1.  None of the professors mentioned in this complaint played any role in initiating this lawsuit, and they provided no information to the plaintiff or its attorneys.

18. Ernie Young is another famous and distinguished legal scholar whom Northwestern refused to hire because he is a white man. Professor Young currently serves as the Alston & Bird Distinguished Professor of Law at Duke Law School, and he was elected to the American Law Institute in 2006. He graduated from Harvard Law School in 1993 and clerked for Judge Michael Boudin on the First Circuit and for Justice David H. Souter on the Supreme Court of the United States. He has authored over 40 law-review articles and published many influential works in the nation's leading law journals. Like Professor Volokh, Professor Young's accomplishments exceed those of nearly every professor currently on the Northwestern Law School faculty.

19. Many on Northwestern's faculty wanted to hire Professor Young. But the Rodriguez-chaired appointments committee blocked him and refused to advance his candidacy to the faculty for a vote, despite his stellar credentials and qualifications. The committee's decision to block Professor Young had nothing to do with his abilities as a scholar or teacher. It was because Professor Young is a white man and Rodriguez and his fellow committee members are determined to appoint women, racial minorities, or homosexual or transgender individuals, even when those candidates are far less accomplished than Professor Young.

20. Professor Ilan Wurman is another victim of Northwestern's unlawful and discriminatory hiring practices. During the 2019–2020 hiring cycle, Northwestern Law School's appointments committee unanimously recommended Wurman for a tenure-track appointment. But then-Associate Dean Sarah Lawsky led the charge to defeat Professor Wurman's appointment when it came to a faculty vote. Lawsky expressly stated at a faculty meeting that she opposed Wurman's appointment to the faculty because he is a white man. Nadav Shoked, another professor on Northwestern's faculty, joined Lawsky in vehemently opposing the hiring of Professor Wurman. Janice Nadler also actively opposed Professor Wurman's appointment because she

wants to hire women and nonwhites rather than white men, and she repeatedly and openly expresses that view to her colleagues.

21.   Northwestern's hiring mandate has led to the hiring of patently unqualified professors. Destiny Peery, a black female who graduated from Northwestern Law School near the bottom of her class, was hired in 2014 as a tenure-track professor at Northwestern Law School—even though the faculty at Northwestern was fully aware of her abysmal academic record as a student at the law school. Several faculty members expressed concerns that Peery was unqualified for an academic appointment and incapable of producing serious scholarship.

22.   But then-Dean Dan Rodriguez, during a faculty meeting, threatened to withhold bonuses from any faculty member who would vote against Peery or attempt to thwart her appointment. At Northwestern, a professor's fixed salary constitutes only 2/3 or 3/4 of his or her total compensation; the remainder is paid as a bonus that is entirely at the discretion of the dean. The opposition to Peery crumbled in response to these threats from the dean.

23.   Peery was hired because she is a black female, as numerous faculty members explicitly stated when discussing her candidacy. Peery would never even have been considered for a faculty appointment at Northwestern if she had been white or a member of a different race, and Peery was hired over white male candidates who were vastly more capable and qualified than she was.

24.   During Peery's time as a law student at Northwestern, two law professors, Janice Nadler and Shari Diamond, pressured other instructors at Northwestern to give Peery higher grades, even though law-school grading at Northwestern is supposed to be blind and exams are graded anonymously. Nadler and Diamond were attempting to groom Peery for a future appointment to the faculty—not because of Peery's abilities but because of her race—and Nadler and Diamond knew that Peery's poor law-school grades could be an obstacle to a future faculty appointment.

25.   Despite the law school's blind grading of exams, professors are permitted to adjust final grades for class participation or other reasons after exam grades are matched with student names. Professors are not required to provide a justification or reason for why they increased or decreased a student's grade, so there is nothing to prevent an ideologically motivated professor from adjusting a student's final grade on account of race.

26.   A candidate with a law-school record like Peery's would not even be considered for a tenure-track position at Northwestern in the absence of racial preferences. White faculty candidates will not be considered by Northwestern for an entry-level appointment unless they graduated near the top of their class from an elite law school. Peery had a below-average academic record at a law school that isn't even ranked in the top 10. Peery received her appointment at Northwestern because she is a black woman, and because Northwestern discriminates in favor of blacks (and women) and against white men when hiring its faculty.

27.   Three years after Peery was hired, she came up for mid-tenure review. Law schools typically conduct this review after an entry-level hire's first three years, and at this point they decide whether the professor should be retained or promoted. The decision whether to award tenure comes a few years later, after an entry-level hire's fifth or sixth year on the job. As part of this process, Peery had to submit all scholarship that she had produced after her initial appointment to the faculty.

28.   Janice Nadler, of all people, was appointed to chair the promotion committee that would review Peery's scholarship and issue a recommendation to the faculty. Nadler is the professor who had pressured her colleagues to give Peery higher grades during her time as a law student in the hopes of facilitating Peery's future appointment to the faculty. *See supra*, at paragraph 24.

29.   Peery (unsurprisingly) had written almost nothing during her first three years as a tenure-track professor. Yet when Nadler presented Peery's case to the faculty, she falsely claimed that Peery had produced several new publications since she had been hired. It turned out that all but one of these "new" papers had been written *before* Peery's appointment at Northwestern, and consisted mostly of chapters from Peery's Ph.D. dissertation. Peery's initial appointment to Northwestern had already been based on that work, and pre-appointment work cannot be considered or used to justify retention or promotion. When Nadler's colleagues on the faculty learned of her deception, they were incensed.

30.   Nadler knew that she was misrepresenting Peery's publication record to her faculty colleagues. Yet she did this because Peery is black and Nadler wanted a black female promoted to associate professor despite Peery's failure to produce adequate scholarship. Nadler would never have inflated or intentionally misled her colleagues about the publication record of a white male professor seeking promotion.

31.   After Nadler was confronted with her dishonest portrayal of Peery's publication record, Nadler changed her tune and tried to excuse Peery's failure to produce scholarship by claiming that Peery was too busy doing institutional work. Nadler also blamed then-Dean Dan Rodriguez for inviting Peery to participate in too many panels and presentations. At the faculty meeting on Peery's promotion, several faculty members, including Dean Rodriguez, said that Peery had received so many invitations to panels and presentations because the law school desperately needed Peery to serve as the token black participant at these events, which left Peery with no time to write. The faculty then voted to promote Peery to associate professor, even though she had written almost nothing since her initial appointment to the faculty.

32.   Two years after her promotion to associate professor, Peery still failed to produce any scholarship that could warrant a tenured appointment. At this time, Peery was gently told that she should not seek tenure. Peery then had the chutzpah to accuse

Northwestern of racism for denying her tenure, pretending that she was a victim of race and sex discrimination when racial preferences were the very reason she was hired in the first place.

33. Peery failed to obtain an academic appointment elsewhere after departing Northwestern, despite the overwhelming discriminatory preferences that black women receive on the academic hiring market.

34. In 2015, one year after the hiring of Peery, the Northwestern faculty hired another unqualified black woman named Candice Player, who (like Peery) failed to obtain tenure after proving herself incapable of producing scholarship that could justify a tenured appointment. Player also struggled in the classroom, and admitted to colleagues that she did not understand the material she was teaching and couldn't handle the students' questions. In one of her classes, Player gave a final exam in which she had plagiarized an exam hypothetical from another source, because Player was too lazy to write her own exam question. Some (but not all) of the students in this class were already familiar with this hypothetical because Player had taken it from a publicly available source, giving those students an undeserved advantage and undermining the integrity of the curved exam. This exam fiasco contributed to Player's departure from the law school in 2019.

35. Player, like Peery, failed to obtain another academic appointment after leaving Northwestern, despite the overwhelming discriminatory preferences that black women receive on the academic hiring market.

36. Player, like Peery, was hired only because of her race, and then-Dean Rodriguez (as with Peery) ramrodded Player's appointment through the faculty by threatening to withhold bonuses from any professor who had the temerity to question the wisdom or legality of the appointment. Player would never even have been considered for a faculty appointment at Northwestern if she had been white or a member

of a different race, and Player was hired over white male candidates who were vastly more capable and qualified than she was.

37.   During the 2019–2020 academic year, Northwestern extended an offer to Paul Gowder, a black professor from the University of Iowa. Although Gowder had produced scholarship and obtained tenure from Iowa in 2017, he was hired by Northwestern because he is black, and it was made clear to the faculty throughout the hiring process that only a black person would be considered for the position that Gowder was chosen for. If Gowder had been white, he would not have been considered for any type of faculty appointment at Northwestern.

38.   During the 2019–2020 academic year, then-Dean Kimberly A. Yuracko wanted to hire both Gowder and Heidi Kitrosser from the University of Minnesota. Kitrosser is married to Northwestern law professor David Dana, yet she had been twice rejected by the Northwestern faculty for an appointment despite her marriage to Dana. Yuracko is close friends with both Kitrosser and Dana, and she wanted to bring up Kitrosser for a third time and get her approved. So she offered a bargain to Professor Steve Calabresi, a conservative and co-founder of the Federalist Society who was serving on the lateral-appointments committee during the 2019–2020 hiring cycle. Dean Yuracko told Calabresi that if he would support the lateral appointments of Gowder and Kitrosser, despite the racial preferences and nepotism surrounding their candidacies, then Yuracko would support an entry-level appointment for Ilan Wurman, a Federalist Society member supported by Professor Calabresi. Professor Wurman is a white male but also gay, so his appointment would not have offended Northwestern's diversity hiring directive.

39.   Dean Yuracko (of course) had the faculty vote on Gowder and Kitrosser before Wurman. Both Gowder and Kitrosser were approved for lateral appointments with Calabresi's support. But when Yuracko brought up Professor Wurman for a vote, his appointment was torpedoed by then-Associate Dean Sarah Lawsky, who stated at

the faculty meeting that she did not want a white male. Dean Yuracko did not lobby her colleagues to support Professor Wurman's appointment and worked behind the scenes to sabotage it, despite her promise to Professor Calabresi and despite the appointment committee's unanimous endorsement of Professor Wurman's candidacy.

40. Northwestern doubled down on its racial preferences for black faculty candidates after the death of George Floyd in 2020, in response to pressure from students who complained that black faculty were insufficiently represented at Northwestern's law school—even though 8% of the law school's tenure-track faculty (at the time) were black and only 5% of all lawyers (at the time) were black. *See* Elvia Malagón, *As country reckons with racial disparities, Northwestern law students continue push for more Black faculty members*, Chicago Sun Times (July 9, 2020), available at http://bit.ly/3WGJOHh (last visited on January 31, 2025) (attached as Exhibit 2) ("About 8% of Northwestern Pritzker School of Law's tenure-track faculty are Black"); American Bar Assocation, Lawyers by Race & Ethnicity, available at http://bit.ly/4jHGxBa (last visited on January 31, 2025) (attached as Exhibit 3) ("According to the American Bar Association's 2020 Profile of the Legal Profession, . . . . 5% of all lawyers are African American"). Woke law students demanded that the law school increase its already pervasive use of race and sex preferences in faculty hiring by giving even greater hiring preferences to female and minority faculty candidates:

> [S]tudents at the law school had pushed for the administration to address the low number of Black faculty members teaching there.
>
> Frustrated by the lack of action over diversity concerns that students had spoken out about for months and by top school officials not explicitly stating, "Black lives matter," students like McKayla Stokes, a recent law school graduate, went public with their concerns. . . .
>
> "That my silence was contributing to the racist environment, it no longer sat right for me to not speak up," Stokes said.

> In recent weeks, she and others used the hashtag #NLawIndifference, a spin on the school's marketing slogan, to chronicle their efforts to get the law school to spell out a plan to hire, retain and promote diverse faculty members.

Elvia Malagón, *As country reckons with racial disparities, Northwestern law students continue push for more Black faculty members*, Chicago Sun Time (July 9, 2020), available at http://bit.ly/3WGJOHh (last visited on January 31, 2025) (attached as Exhibit 2).

41. Then-Dean Kim Yuracko, instead of reminding these students that federal law prohibits racial preferences in faculty hiring, issued an "anti-racism" letter to the law-school community announcing that the law school would consciously and intentionally "prioritize" the hiring preferences of black faculty—not only with respect to tenure-track slots but also with its "visiting faculty and adjunct hires." Yuracko wrote:

> Starting now, the senior leadership team and I commit to fostering and creating a Law School community premised on and dedicated to anti-racism. As an institution, we will not sit on the sidelines as the Black members of our community bear the pain and anger associated with navigating a society replete with systemic racism or with navigating our campus—where, above all, they should feel seen, heard, supported, and treated equitably and with respect.

> We will take action, and we will do so more swiftly than we have thus far. This letter outlines a few of my immediate commitments:

> - **Faculty Hiring:** Hiring more Black faculty and faculty of color—and retaining and promoting those faculty members—is a top priority for me. We need to build a faculty that is reflective of our student body and the Law School's diverse ideals. I am pleased that both of our faculty hires this past year, Paul Gowder, who will join our tenure-line faculty, and Robin Walker Sterling, who will join our faculty as the Mayer Brown/Robert A. Helman Professor of Law and director of the Bluhm Legal Clinic, will help further this goal. This is only a start. In addition to recruiting diverse full-time hires, we will prioritize this through visiting faculty and adjunct hires.

Yuracko anti-racism letter (attached as Exhibit 4). The law school also increased its use of discriminatory and illegal racial preferences in response to these student-led demands.

42. In 2022, Northwestern Law hired Jamelia Morgan, a black woman, from a low-ranked school (UC-Irvine), who had no competing offers from any schools ranked higher than Northwestern. Morgan was only in her fourth year of teaching, barely tenured, with past appointments at the University of Connecticut (three years) and one year at UC-Irvine. To attract Morgan, the dean gave her a $900,000 budget to start a new center at Northwestern Law School called "the Center for Racial and Disability Justice." No other faculty hire in the recent history of Northwestern Law School has ever received a budget of this sort. Northwestern Law School has far more accomplished scholars than Jamelia Morgan on its faculty, and none of them have ever been offered a $900,000 center to run. Morgan received this money only because she is a black affirmative-action hire. Morgan would never have been considered for an appointment at Northwestern if she had been white, and Morgan was hired over white male candidates who are vastly more capable and qualified than she is.

43. Since Morgan was hired in 2022, her Center for Racial and Disability Justice has hosted a grand total of two events. One of those was its "Launch Event" on November 16, 2022, which consisted of nothing more than a one-hour video in which Dean Hari Osofsky read from a binder and asked softball questions to Morgan. *See* http://bit.ly/4cGSyCD. The only other event occurred on June 3, 2023, after the spring semester had concluded and Northwestern's students were gone for the summer. *See* http://bit.ly/3XMKtYS [https://perma.cc/ED2C-7QJQ]. The event was entitled "Accessible Public Safety Global Social Impact Conference," and no scholars were listed as participants. The Center conducted no events during the 2023–2024 academic year. And the Center has no future events scheduled. The "Events" link on the Center's website leads to a blank page, although it graciously invites viewers to

"Please check back again for future events." *See* Events, http://bit.ly/45NZgV2 [https://perma.cc/4KTK-DSQS]. In two years, Morgan's $900,000 center has made no contributions whatsoever to academic life at Northwestern University. Yet Northwestern continues to waste money on this useless center to pander to an affirmative-action hire who never deserved her appointment in the first place.

44.    In 2024, Northwestern Law extended an offer to Myriam Gilles, a black law professor at Cardozo Law School. It was made clear to the Northwestern faculty that the law school had to hire a black woman for this position, and that if they did not vote to approve the appointment of Gilles then the law school would have to hire a black woman later who would almost certainly be worse. Gilles would not have been considered for a faculty appointment at Northwestern if she had been white or a member of a different race, and Gilles was hired over white male candidates who had records demonstrating that they were vastly more capable and qualified than she was.

45.    This regime of illegal race and sex preferences is perpetuated and enforced by Northwestern's law-school deans and its faculty appointments committee. The appointments committee has complete control over which candidates will be brought in for interviews or voted upon by the faculty, and its members are chosen each year by the dean with no formal input from the faculty. Northwestern's law-school deans ensure that faculty members who are known to oppose discriminatory race and sex preferences are never selected for the appointments committee.

46.    The appointments committee makes sure that white men are blocked from further consideration at the committee stage, so that the faculty has no chance to vote on them. The appointments committee, for example, nixed any consideration of Eugene Volokh by refusing even to interview him even though he had expressed a strong interest in Northwestern and was supported by many on the faculty. The appointments committee also refused to allow the faculty to vote on whether to hire Ernie Young.

47.   Of course, the appointments committee will occasionally allow some white men to proceed to the interview stage, because if the committee never allowed any white men to interview then that would create a strong inference of discriminatory motive. But white men who proceed to the interview stage are never hired unless they are in a high-demand and low-supply field (such as tax or empirical work), where it is difficult or impossible to find female or minority scholars. White men who write and teach in public law, such as Eugene Volokh and Ernie Young, will not be hired at Northwestern no matter how stellar their scholarship and credentials are.

48.   The following charts show how Northwestern has conducted its interviews and hiring decisions over the last three academic years:

### Year 2023–2024

| | demographic | white man | woman (any race) | non-white (any sex) | offer made | offer to white man | offer to anyone other than white man |
|---|---|---|---|---|---|---|---|
| Haley Proctor | woman | | 1 | | | | |
| Monica Haymond | woman | | 1 | | 1 | | 1 |
| James Hicks | white man | 1 | | | | | |
| Daniel Rauch | white man | 1 | | | | | |
| Kate Redburn | white non-binary | | 1 | | 1 | | 1 |
| Emily Chertoff | woman | | 1 | | 1 | | 1 |
| Omavi Shukur | black man | | | 1 | | | |
| Edwin Hu | asian man | | | 1 | 1 | | 1 |
| Ela Leshem | woman | | 1 | | | | |
| Emmauel Mauleón | latino man | | | 1 | | | |
| Chika Okafor | black man | | | 1 | 1 | | 1 |
| Eisha Jain | asian woman | | 1 | 1 | | | |
| Peter Conti-Brown | white man | 1 | | | | | |
| Myriam Gilles | black woman | | 1 | 1 | 1 | | 1 |
| Lisa Washington | black woman | | 1 | 1 | | | |
| Jonathan Choi | asian man | | | 1 | | | |
| | | | | | | | |
| Total | | 3 | 8 | 8 | 6 | 0 | 6 |

6 offers made in 2023–24 hiring cycle; 0 to white men.

## Year 2022–2023

| name | demographic | white man | woman (any race) | nonwhite (any sex) | offer made | offer to white man | offer to anyone other than white man |
|---|---|---|---|---|---|---|---|
| Christopher Yoo | asian man | | | 1 | 1 | | 1 |
| Ernie Young | white man | 1 | | | | | |
| Stephanie Didwania | white woman | | 1 | | 1 | | 1 |
| Jill Horwitz | white woman | | 1 | | 1 | | 1 |
| Kyle Rozema | white man | 1 | | | 1 | 1 | |
| Kate Shaw | white woman | | 1 | | 1 | | 1 |
| Rachel Sachs | white woman | | 1 | | | | |
| Craig Konnoth | black man, LGBT | | | 1 | | | |
| Kristin Johnson (talk cancelled by her) | black woman | | 1 | 1 | | | |
| Elizabeth Katz | white woman | | 1 | | | | |
| Shirin Bakshay | asian woman | | 1 | 1 | | | |
| Dhruv Aggraval | asian man | | | 1 | 1 | | 1 |
| Vince Buccola | white man | 1 | | | | | |
| Hanna Shaffer | white woman | | 1 | | 1 | | 1 |
| Chris Havasy | white man | 1 | | | | | |
| Jose Argueta Funes | hispanic man | | | 1 | 1 | | 1 |
| Diana Reddy | black woman | | 1 | | 1 | | 1 |
| Michael Francus | white man | 1 | | | | | |
| Michael Morse | latino man | | | 1 | | | |
| Alex Zhang | asian man | | | 1 | | | |
| Caley Petrucci | white woman | | 1 | | | | |
| | | | | | | | |
| Total | | 5 | 10 | 8 | 9 | 1 | 8 |
| | | | | | | | |
| Note: refused to interview Eugene Volokh | | | | | | | |

9 offers made in 2022–23 hiring cycle; only 1 to white man (Kyle Rozema)

**Year 2021-2022**

| Name | demographic | white man | woman (any race) | nonwhite (any sex) | offer made | offer to white man | offer to anyone other than white man |
|---|---|---|---|---|---|---|---|
| Neja Jain | asian woman | | 1 | 1 | 1 | | 1 |
| Jamelia Morgan | black woman | | 1 | 1 | 1 | | 1 |
| Nicole Summers | white woman | | 1 | | 1 | | 1 |
| Kathleen Claussen | white woman | | 1 | | 1 | | 1 |
| Ari Glogower | white man | 1 | | | 1 | 1 | |
| Jacob Goldin | white man | 1 | | | 1 | 1 | |
| Angela Onwuachi-Willig | black woman | | 1 | 1 | | | |
| Bennett Capers | black man | | | 1 | | | |
| Daria Roithmayr | hispanic woman | | 1 | | | | |
| Osagie Obasogie | black man | | | 1 | | | |
| Julie Suk | asian woman | | 1 | 1 | | | |
| Veronica Root Martinez | black woman | | 1 | 1 | | | |
| Kristin Hickman | white woman | | 1 | | | | |
| Nyamagaga Gondwe | black woman | | 1 | 1 | | | |
| Eric Hovenkamp | white man | 1 | | | | | |
| India Thusi | black woman | | 1 | 1 | | | |
| Ralf Michaels | white man | 1 | | | | | |
| | | | | | | | |
| Total | | 4 | 11 | 9 | 6 | 2 | 4 |

6 offers made in 2021–22 hiring cycle; only 2 to white men,
both in a high-demand, low-supply field (tax law).

49.   The 2021–22 hiring cycle was unusual because *two* white men received of-
fers to join the faculty. But the offer that Northwestern extended to Jacob Goldin was
a sham. Goldin was already a tenured professor at Stanford Law School and had re-
ceived a lateral offer from the University of Chicago. There was zero chance that
Goldin would accept a lateral offer from Northwestern, which is ranked significantly
below both Chicago and Stanford. The Northwestern faculty knew full well that
Goldin would reject their offer. But they extended him an offer for the sole purpose
of making their policy of discriminating against white men seem somewhat less obvi-
ous to someone who simply examines the numbers. Ari Glogower, the other white

man who received an offer during the 2021–22 academic year, was hired only because Northwestern was desperate to hire a tax scholar and there are very few women or minorities in that field.

50.    The only other white man to even receive an *offer* from Northwestern in the last three hiring cycles was Kyle Rozema. Rozema was a truly unique case because he served as a post-doctoral fellow at Northwestern Law School from 2015–2017, so everyone on the faculty already knew him and he was well-liked during his time there. Rozema also co-authored a study claiming that race and sex preferences on student-run law reviews increase citations, which delighted the affirmative-action devotees and leftist ideologues on Northwestern's faculty and enabled him to earn their support despite his status as a white man. *See* Adam Chilton, et al., *Assessing Affirmative Action's Diversity Rationale*, 122 Colum. L. Rev. 331, 337 (2022). Finally, Rozema is an empiricist, a field in which it is very difficult to find female or minority scholars.

51.    Apart from these one-off situations, no other white man was even given an offer during the last three hiring cycles, while superstar academics like Eugene Volokh and Ernie Young were rejected in favor of candidates with mediocre and undistinguished records.

## II. Northwestern's 2022 Law-School Dean Search

52.    In 2022, Northwestern needed to appoint a new dean. The chair of the dean's search committee rigged the process to ensure that no man would be chosen for the job because she wanted another woman to succeed then-Dean Kimberly Yuracko.

53.     The chair of the dean's search committee conducted the search in extreme secrecy and excluded her faculty colleagues from the process of selecting finalists. In the past, dean candidates were always brought in and interviewed with the entire faculty. The chair changed this process so that she could more easily nix male dean candidates. The rest of the law-school faculty learned of finalists for the dean's job only

through committee leaks. The faculty learned of two finalists through leaks from the dean's search committee and (of course) both were women: Angela Onwuachi-Willig, a black critical race theorist, and Hari Osofsky, who wound up getting the job. Several members of Northwestern's law faculty protested to the university provost and complained that the chair was operating the dean's search committee in violation of school rules. The provost ignored all of their concerns.

### III. Plagiarism Committed By Northwestern's Affirmative-Action Hires

54.   Northwestern's use of illegal race and sex preferences has reached the point where the university is willing to hire plagiarists and overlook their breaches of the standards of academic integrity—as long as the offending plagiarist comes from a preferred identity group. Myriam Gilles, whom the university appointed to the faculty during the 2023–24 academic cycle, and who was hired because the law school was determined to appoint a black woman rather than search for the best available candidate regardless of race and sex, has repeatedly copied language verbatim from other authors without any attribution or quotation marks—a practice known as "verbatim plagiarism" or "direct plagiarism."[2]

### A.   Gilles's Plagiarism Of David Cooper

55.   In *The Day Doctrine Died: Private Arbitration and the Rule of Law*, 2016 U. Ill. Rev. 371, Myriam Gilles copied two passages verbatim from David Cooper, *Blowing the Whistle on Consumer Financial Abuse*, 163 U. Pa. L. Rev. 557 (2015), without citing Cooper and without placing quotation marks around the copied material:

| Cooper (p. 566) | Gilles (p. 405) |
| --- | --- |

---

2.   *See How to Avoid Plagiarism*, Northwestern University Office of the Provost, http://bit.ly/3XJW3ST.

| | |
|---|---|
| The Bureau is shielded from both congressional and presidential influence because it is funded by a fixed percentage transfer from the FRB rather than by the appropriations process; its rule-makings are not subject to review by the Office of Information and Regulatory Affairs (OIRA); and its sole director serves a five-year term and can be removed only for cause. | Currently, the independent agency is shielded from both congressional and presidential influence because it is funded by a fixed percentage transfer from the Federal Reserve Bank, rather than by the appropriations process. Further, its sole director serves a five-year term and can be removed only for cause. |

| Cooper (p. 566–67) | Gilles (p. 405 n.206) |
|---|---|
| For example, on February 27, 2014, the House of Representatives passed the Consumer Financial Freedom and Washington Accountability Act, H.R. 3193, a bill that would replace the CFPB's Federal Reserve–derived funding with a yearly appropriation. | For example, on February 27, 2014, the House of Representatives passed the Consumer Financial Freedom and Washington Accountability Act, H.R. 3193, 113th Cong. (2014), a bill that would replace the CFPB's Federal Reserve-derived funding with a yearly appropriation. |

### B.    Gilles's Plagiarism Of Shelby Leighton

56.    In *Arbitration's Unraveling*, 172 U. Pa. L. Rev. 1063 (2024), Gilles copied numerous passages from an amicus brief filed by Shelby Leighton in *Yost v. Everyrealm Inc., et al.*, No. 1:22-cv-06549-PAE (S.D.N.Y.) (Docket Entry 71), without citing Leighton and without placing quotation marks around the copied material:

| Leighton | Gilles (p. 1077) |
|---|---|
| [T]he legislative history shows the drafters' deliberate intent not to divide cases by sending some claims from the same case to arbitration. Several senators, including a lead sponsor of the Act, expressly addressed this issue during debates, stating that keeping cases whole "is exactly what we intended the bill to do." 168 Cong. Rec. S627 (daily ed. Feb. 10, 2022) (statement of Sen. Kirsten Gillibrand). Senator Gillibrand | [T]he legislative history of the EFAA, which reveals the drafters' deliberate intent *not* to divide cases by sending some claims from the same case into arbitration. Several senators, including a lead sponsor of the Act, addressed this precise issue during debates of the EFAA, stating that keeping cases whole "is exactly what we intended the bill to do." Senator Gillibrand explained: "When a sexual assault or sexual harassment survivor files a court case in order to seek |

explained that the bill included the "re-lates to" language to keep cases covered by EFASASHA together throughout litigation. "When a sexual assault or sexual harassment survivor files a court case in order to seek accountability, her single case may include multiple claims," the Senator explained. *Id*. "[I]t is essential that all the claims related to the sexual assault or harassment can be adjudicated at one time" to ensure that a victim need not "relive that experience in multiple jurisdictions." *Id*. Stating the intent of the Act again for the record, she concluded, "To ensure that a victim is able to realize the rights and protections intended to be restored to her by this legislation, all of the related claims will proceed together." *Id*. Senator Durbin, Chair of the Judiciary Committee, echoed that intent: "So to clarify, for cases which involve conduct that is related to a sexual harassment dispute or sexual assault dispute, survivors should be allowed to proceed with their full case in court regardless of which claims are ultimately proven. I am glad that is what this bill provides." 168 Cong. Rec. S626 (daily ed. Feb. 10, 2022) (statement of Sen. Richard Durbin).

accountability, her single case may include multiple claims [but] it is essential that all the claims related to the sexual assault or harassment can be *adjudicated at one time* to ensure that a victim need not relive that experience in multiple jurisdictions." In addition, Senator Dick Durbin, Chair of the Senate Judiciary Committee, expressed (without contradiction from any of his Republic colleagues) his understanding of the statute's operation: "So to clarify, for cases which involve conduct that is related to a sexual harassment dispute or sexual assault dispute, survivors should be allowed to proceed with *their full case in court* regardless of which claims are ultimately proven. I am glad that is what this bill provides."

### C.    Gilles's Plagiarism Of Lisa Brauner

57.    In *Arbitration's Unraveling*, 172 U. Pa. L. Rev. 1063 (2024), Gilles copied the following passage from Lisa M. Brauner, *The Impact On Employers Of The "Ending Forced Arbitration Of Sexual Assault And Sexual Harassment Act,"* Mondaq (April 22, 2022), http://bit.ly/4gGZrGX, without citing Brauner and without placing quotation marks around the copied material:

|  Brauner  |  Gilles (p. 1074)  |
| --- | --- |

| The FAIR Act would ban all mandatory pre-dispute arbitration agreements for all types of employment disputes—not just sexual assault and sexual harassment—and also for consumer, antitrust, or civil rights disputes. | The FAIR Act would ban mandatory, pre-dispute arbitration agreements in *all* types of employment disputes—not just claims of sexual assault and sexual harassment—along with consumer, antitrust, and civil-rights disputes. |

### D. Gilles's Plagiarism Of Laveta Casdorph

58. In *Reinventing Structural Reform Litigation: Deputizing Private Citizens in the Enforcement of Civil Rights*, 100 Colum. L. Rev. 1384 (2000), Gilles copied the following passages from Laveta Casdorph, *The Constitution and Reconstitution of the Standing Doctrine*, 30 St. Mary's L.J. 471 (1999), without citing Casdorph and without placing quotation marks around the copied material:

| Casdorph (p. 514) | Gilles (p. 1420) |
|---|---|
| Citizen suit provisions generally authorize "any person" to bring an action against "any person" who is in violation of the relevant statute. | Citizen suit provisions generally authorize "any person" to bring an action against "any person" who is in violation of the relevant statute. |

| Casdorph (p. 501) | Gilles (p. 1396, n.42) |
|---|---|
| The following year, in the case of *Simon v. Eastern Kentucky Welfare Rights Organization*, the Court determined that the indigent plaintiffs lacked standing to challenge IRS regulations. According to the Court, the claimants could not possibly prove that the IRS rules, which changed the requirements for tax-exempt status, caused hospitals to reduce the amount of care to the poor, nor could they prove that the requested remedy—a court's order to strike the rules—would cause the hospital to restore the amount of care to previous levels. | *See, e.g.*, *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 27 (1976) (denying standing to indigent persons to challenge IRS regulations because claimants could not possibly prove that IRS rules caused hospitals to reduce the amount of care to the poor, nor could they prove that the requested remedy—a court order to enjoin application of the rules—would cause hospitals to restore the amount of care to previous levels). |

59.   Gilles even plagiarized Casdorph's footnotes and footnote parentheticals, without any attribution to Casdorph and without any quotation marks around the copied text:

| Casdorph (p. 491 n.87) | Gilles (p. 1392 n.29) |
|---|---|
| *see also Hardin v. Kentucky*, 390 U.S. 1, 6 (1968) (holding that "when the particular statutory provision invoked does reflect a legislative purpose to protect a competitive interest, the injured competitor has standing to require compliance with that provision"); *Norwalk CORE v. Norwalk Redevelopment Agency*, 395 F.2d 920, 932-37 (2d Cir. 1968) (holding that alleged victims of housing discrimination had standing under the Housing Acts of 1949 and 1954); *Office of Communications of the United Church of Christ v. FCC*, 359 F.2d 994, 1000-06 (D.C. Cir. 1966) (granting standing to television viewers under the Federal Communications Act to contest the renewal of a broadcast license); *Scenic Hudson Preservation Conference v. Federal Power Comm'n*, 354 F.2d 608, 615-17 (2d Cir. 1965) (granting standing under the Federal Power Act to protect the interests of plaintiffs who use the environment). | *see also Hardin v. Kentucky Utils. Co.*, 390 U.S. 1, 6 (1968) (finding that "when the particular statutory provision invoked does reflect a legislative purpose to protect a competitive interest, the injured competitor has standing to require compliance with that provision"); *Norwalk CORE v. Norwalk Redev. Agency*, 395 F.2d 920, 932 (2d Cir. 1968) (finding that alleged victims of housing discrimination had standing to sue under the Housing Act of 1954); *Office of Communication of the United Church of Christ v. FCC*, 359 F.2d 994, 1000 (D.C. Cir. 1966) (granting standing to television viewers under the Federal Communications Act to contest the renewal of a broadcast license); *Scenic Hudson Preservation Conf. v. Federal Power Comm'n*, 354 F.2d 608, 616 (2d Cir. 1965) (granting standing under the Federal Power Act to plaintiffs with "special interests" in the environment). |

**E.    Gilles's Plagiarism Of Marshall Miller**

60.   In *Reinventing Structural Reform Litigation: Deputizing Private Citizens in the Enforcement of Civil Rights*, 100 Colum. L. Rev. 1384 (2000), Gilles copied the following passages from Marshall Miller, *Police Brutality*, 17 Yale Law & Pol'y Rev. 149 (1998), without citing Marshall and without placing quotation marks around the copied material:

|  Miller (p. 174) | Gilles (p. 1403) |
|---|---|

| | |
|---|---|
| [T]he drafters . . . proposed extending the authority to initiate pattern or practice suits to individuals as well as to the federal government, thus increasing the reach and significance of the legislation. | [T]he drafters hoped that extending the authority to initiate pattern or practice suits to individuals as well as to the federal government would increase both the reach and significance of the legislation. |

| Miller (p. 174) | Gilles (p. 1403) |
|---|---|
| After twelve years of Republican control of the executive branch, the drafters—liberal Democratic Members of Congress—were obviously reluctant to entrust enforcement solely to the Department of Justice. | After twelve years of Republican control of the executive branch, Democratic members of Congress were reluctant to entrust enforcement solely to the Justice Department. |

61.    Gilles also took a passage from Miller and replaced a few (but not all) of its phrases with phrases of her own, while failing to cite Miller or put quotation marks around the copied portions of the sentence. This practice is known as "mosaic" plagiarism:[3]

| Miller (p. 174) | Gilles (p. 1403) |
|---|---|
| Reacting to the Rodney King videotape and the failure of traditional legal sanctions to curtail police abuses, the drafters of § 14141's precursor, the Police Accountability Act, were searching for new legal regimes to force police departments to adhere to constitutional principles. | [I]n response to the Rodney King incident and the perceived failure of traditional legal sanctions to curtail police abuses, the drafters of the Police Accountability Act felt it necessary to experiment with new legal theories to reform the way police departments conducted themselves. |

### F.    Gilles's Plagiarism Of Gretchen Forney

62.    In *Reinventing Structural Reform Litigation: Deputizing Private Citizens in the Enforcement of Civil Rights*, 100 Colum. L. Rev. 1384 (2000), Gilles copied the following passages from Gretchen L. Forney, *Qui Tam Suits: Defining the Rights and Roles of the Government and the Relator under the False Claims Act*, 82 Minn. L.

---

3.  *See How to Avoid Plagiarism*, Northwestern University Office of the Provost, http://bit.ly/3XJW3ST.

Rev. 1357 (1998), without citing Forney and without placing quotation marks around the copied material:

| Forney (p. 1365–66) | Gilles (p. 1422) |
|---|---|
| [T]he Act was amended in 1943 to limit the circumstances under which an individual could bring a qui tam action. The 1943 version of the Act represented the government's belief that it could discover and prosecute fraud on its own. | Congress amended the statute in 1943 to limit the circumstances under which a private individual could bring suit. Underlying the 1943 amendment was the government's belief that it could discover and prosecute fraud on its own . . . . |

| Forney (p. 1365 n.54) | Gilles (p. 1422 n.158) |
|---|---|
| The trend of bringing suits based on fraud already known to the government culminated with *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943), where the Supreme Court held that the FCA permitted private persons to bring suit even if they copied their complaint from an indictment and had no original information regarding the defendant's wrongful conduct. *See id.* at 545-48. In a subsequent letter to a member of Congress, the Attorney General summarized the harm of the Marcus decision by stating that the decision created a "scramble among would-be informers' to see who can be the first to file civil suit based on the charges in the [already filed] indictment." | In *United States ex rel. Marcus v. Hess,* the Supreme Court held that the FCA permitted private persons to bring suit even if they copied their complaint from an indictment and had no original information regarding the defendant's fraudulent conduct. See 317 U.S. 537, 545-48 (1943). In a subsequent letter to Congress, the Attorney General expressed concern that the *Marcus* decision would create a "scramble among would-be informers" to see who could be the first to file suit based on charges in an existing indictment. |

63.  Gilles also copied text from one of Forney's footnote parentheticals:

| Forney (p. 1366 n.55) | Gilles (p. 1422, n.158) |
|---|---|
| *See* Blanch, *supra* note 22, at 58 (describing the 1943 Amendments as Congress's attempt to prohibit *qui tam* actions that were based on information already in the possession of the government when the action was filed); | *see also* James T. Blanch *et al.*, *Citizen Suits and Qui Tam Actions: Private Enforcement of Public Policy* 58 (1996) (describing the 1943 Amendments as Congress's attempt to prohibit *qui tam* actions that were based on information |

already known to the government);

. . . .

### G.  Gilles's Plagiarism Of Evan Caminker

64.  In *Reinventing Structural Reform Litigation: Deputizing Private Citizens in the Enforcement of Civil Rights*, 100 Colum. L. Rev. 1384 (2000), Gilles copied the text of a footnote parenthetical word-for-word from Evan H. Caminker, *State Immunity Waivers for Suits by the United States*, 98 Mich. L. Rev. 92 (1999), without citing Caminker and without placing quotation marks around the copied material:

| Caminker (p. 128 n.153) | Gilles (p. 1428, n.181) |
|---|---|
| Allen Steinberg, *From Private Prosecution to Plea Bargaining: Criminal Prosecution, the District Attorney, and American Legal History*, 30 CRIME & DELINQ. (1984) (detailing extensive role of private prosecutors in state law enforcement throughout colonial and early constitutional periods, and demonstrating that the fundamental transformation from a private-enforcement-dependent to a mostly public-dependent law enforcement regime took place in the mid-nineteenth century). | Allen Steinberg, *From Private Prosecution to Plea Bargaining: Criminal Prosecution, the District Attorney, and American Legal History*, 30 Crime & Delinq. 568 (1984) (detailing extensive role of private prosecutors in state law enforcement throughout colonial and early constitutional periods, and demonstrating that the fundamental transformation from a private-enforcement-dependent to a mostly public- dependent law enforcement regime took place in the mid-nineteenth century). |

### H.  Gilles's Plagiarism Of David Horton

65.  In *Crowd-Classing Individual Arbitrations in a Post-Class Action Era*, 63 DePaul L. Rev. 447 (2014) (co-authored with Anthony Sebok), Gilles and her co-author replicated the following text from David Horton, *Arbitration as Delegation*, 86 N.Y.U. L. Rev. 437 (2011), without citing Horton and without placing quotation marks around the copied material:

| Horton (p. 440 n.14) | Gilles & Sebok (p. 463 & n. 61) |
|---|---|
| Under basic economic theory, both contractual partners can benefit from arbitration. See Steven Shavell, *Alternative Dispute Resolution: An Economic* | Under basic economic theory, both contractual partners can benefit from arbitration.[61] |

*Analysis*, 24 J. Legal Stud. 1, 5–7 (1995) (describing benefits that parties might derive from ex ante alternative dispute resolution agreements).

61. *See*, *e.g.*, Steven Shavell, *Alternative Dispute Resolution: An Economic Analysis*, 24 J. Legal Stud. 1, 5–7 (1995) (describing benefits that parties might derive from ex ante alternative dispute resolution agreements).

## I.    Gilles's Plagiarism Of Paul Clement

66.  In *Gutting the Vindication-of-Rights Challenge to Arbitration Agreements*, which Gilles claims was accepted for publication in Volume 82 of the George Washington Law Review yet was never published,[4] and which does not appear on Gilles's CV even though it remains on her SSRN page,[5] Gilles filched the following text from Paul Clement's brief for the respondents in *American Express Co. v. Italian Colors Restaurant*, No. 12-133 (2013), without citing Clement and without placing quotation marks around the copied material:

| Clement (p. 8) | Gilles (p. 7) |
| --- | --- |
| Respondents opposed the motion to compel arbitration on the ground that they would, in fact, be unable to arbitrate their federal statutory rights under the specific arbitration agreement here. | Plaintiffs opposed the motion to compel arbitration on the ground that they would be unable to arbitrate their federal statutory rights under Amex's arbitration clause. |

| Clement (p. 9) | Gilles (p. 7) |
| --- | --- |
| it precludes the possibility of obtaining the kind of market-wide injunctive relief that is often necessary to remedy systemic anticompetitive conduct. | it precluded the possibility of obtaining the kind of market-wide injunctive relief that is often necessary to remedy the type of systemic anticompetitive conduct that is alleged in this case." |

---

4.  *Compare* http:// bit.ly/4eomcxJ ("George Washington University Law Review, Vol. 82, No. 3 (forthcoming 2013)") *with* https://www.gwlr.org/previous-issues (no mention of Gilles's article)

5.  *See*                         https://cardozo.yu.edu/sites/default/files/2020-01/gilles_jan_2020_cv.pdf

| Clement (p. 9) | Gilles (p. 7) |
|---|---|
| The district court nonetheless granted Petitioners' motion to compel arbitration. | [T]he district court nonetheless granted the motion to compel arbitration |

67. Gilles does cite Clement's brief elsewhere in her paper, but not for any of the above-quoted material.

### J. Gilles's Plagiarism Of Michael Kellogg

68. In *Crowd-Classing Individual Arbitrations in a Post-Class Action Era*, 63 DePaul L. Rev. 447 (2014) (co-authored with Anthony Sebok), Gilles and her co-author reproduced the following text from Michael Kellogg's brief for the petitioners in *American Express Co. v. Italian Colors Restaurant*, No. 12-133 (2013), without citing Kellogg and without placing quotation marks around the copied material:

| Kellogg (p. 2) | Gilles & Sebok (p. 458 & n.47) |
|---|---|
| In *Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*, 130 S. Ct. 1758 (2010), this Court held that the FAA prohibits arbitrators from imposing class arbitration on parties that have not agreed to such procedures. | In *Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*,[47] the Court held that the FAA prohibits arbitrators from imposing class arbitration on parties that have not agreed to such procedures. |
| | 47. *Stolt-Nielsen*, 130 S. Ct. at 1758. |

69. Gilles also took Kellogg's parentheticals explaining the holdings of Supreme Court decision, copying them verbatim from Kellogg's brief into *Gutting the Vindication-of-Rights Challenge to Arbitration Agreements*:

| Kellogg (p. 26) | Gilles (p. 19 & n.72) |
|---|---|
| see also CompuCredit, 132 S. Ct. at 671 (distinguishing between procedural choices and substantive guarantees— "the guarantee of the legal power to impose liability"); *Pyett*, 556 U.S. at 265-66 (distinguishing "a prospective waiver of the substantive right" from a | *See also CompuCredit*, 132 S. Ct. at 671 (distinguishing between procedural choices and substantive guarantees— "the guarantee of the legal power to impose liability"); *Pyett*, 556 U.S. at 265-66 (distinguishing "a prospective waiver of the substantive right" from a |

waiver of the procedural right to pro-
ceed in court).

waiver of the procedural right to pro-
ceed in court).

### K.  Gilles's Plagiarism Of The U.S. Chamber of Commerce

70.  In *The Private Attorney General in a Time of Hyper-Polarized Politics*, 65
Ariz. L. Rev. 337 (2023), Gilles copied the following text from a research paper pub-
lished by the U.S. Chamber of Commerce, entitled *TransUnion and Concrete Harm:
One Year Later* (June 2022), http://bit.ly/4ds0YxG, without citing the research pa-
per and without placing quotation marks around the copied material:

| Chamber of Commerce (p. 12) | Gilles (p. 378 & n.255) |
|---|---|
| Spokeo operates an online search engine that aggregates data pulled from thousands of different sources.[21] Users of Spokeo's service can search for someone "by name, e-mail address, or phone number" and obtain information "such as the individual's address, phone number, marital status, approximate age, occupation, hobbies, finances, shopping habits, and musical preferences."[22]  In 2010, Thomas Robins filed suit against Spokeo, alleging that if a user searched for him on its website, Spokeo would display inaccurate information. | In Spokeo, the defendant operated an online search engine that aggregated data scraped from a myriad of online sources, allowing users to search for someone "by name, e- mail address, or phone number" and obtain information "such as the individual's address, phone number, marital status, approximate age, occupation, hobbies, finances, shopping habits, and musical preferences." Spokeo, Inc. v. Robins, 578 U.S. 330, 335–36 (2016).  Plaintiff Robins [sic] claim alleged that if a user searched for him on the Spokeo site, it would display inaccurate information. |

| Chamber of Commerce (p. 18) | Gilles (p. 376 & n.247) |
|---|---|
| The Court explained that a "regime where Congress could freely authorize unharmed plaintiffs to sue defendants who violate federal law . . . would infringe on the Executive Branch's Article II authority."[75] That is because, unless "'an actual case'" exists—a claim in which the plaintiff alleges concrete harm—"the choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the | See TransUnion, 141 S. Ct. at 2207 (explaining that a "regime where Congress could freely authorize unharmed plaintiffs to sue defendants who violate federal law . . . would infringe on the Executive Branch's Article II authority" because "the choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch, not within the purview |

law falls within the discretion of the Executive Branch, not within the purview of private plaintiffs (and their attorneys).   of private plaintiffs (and their attorneys)").

71.   Gilles also copied footnote parentheticals verbatim from the Chamber of Commerce's research paper without citation, quotation marks, or any type of acknowledgement of the stolen text:

| Chamber of Commerce (p. 65 n.196) | Gilles (p. 378 n.259) |
| --- | --- |
| *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1191–93 (10th Cir. 2021) (same for receipt of a single unanswered call and voicemail attempting to collect a medical debt in asserted violation of the FDCPA). | *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1191–93 (10th Cir. 2021) (same for receipt of a single unanswered call and voicemail attempting to collect a medical debt in asserted violation of the FDCPA). |

| Chamber of Commerce (p. 65 n.200) | Gilles (p. 378 n.259) |
| --- | --- |
| *See Seale v. Peacock*, 32 F.4th 1011, 1020–21 (10th Cir. 2022) (treating unauthorized access to a software account as analogous to "trespass to chattels" or "invasion of privacy" . . .) | *Seale v. Peacock*, 32 F.4th 1011, 1020–21 (10th Cir. 2022) (finding unauthorized access to a software account analogous to "trespass to chattels" or "invasion of privacy"). |

**L.   Gilles's Plagiarism Of William C. Kidder**

72.   In *An Autopsy of the Structural Reform Injunction: Oops . . . It's Still Moving*, 58 U. Mia. L. Rev. 143 (2003), Gilles copied the following text from William C. Kidder, *Affirmative Action in Higher Education: Recent Developments in Litigation, Admissions and Diversity Research*, 12 Berkeley La Raza L.J. 173 (2001), without citing Kidder and without placing quotation marks around the copied material:

| Kidder (p. 218) | Gilles (p. 147 n.23) |
| --- | --- |
| Governor Jeb Bush's "One Florida" plan, adopted in November 1999 by executive order, discontinues race-conscious affirmative action within Florida's 10-campus public university system. It will also guarantee admission to at least one of the ten universities in the | Governor Jeb Bush's One Florida Plan, adopted in November 1999 by executive order, discontinues race-conscious affirmative action within Florida's 10-campus public university system and resembles the plans used by Texas and California by guaranteeing all applicants |

system-though not necessarily to students' top choice-for all applicants in the top twenty percent of Florida's high school graduates regardless of standardized test scores of other factors such as school quality. In this respect, the "One Florida" plan resembles the "Ten Percent Plan" in Texas 291 and the "Four Percent Plan" at the University of California

in the top twenty percent of Florida's high school graduates, regardless of standardized test scores, a place in a public university.

### M.     Gilles's Plagiarism Of Christopher Slobogin and William Stuntz

73.   In *In Defense of Making Government Pay: The Deterrent Effect of Constitutional Tort Remedies*, 35 Ga. L. Rev. 845 (2001), Gilles copied the following text from Christopher Slobogin, *Why Liberals Should Chuck the Exclusionary Rule*, 1999 U. Ill. L. Rev. 363 (1999), without citing Slobogin and without placing quotation marks around the copied material:

| Slobogin (p. 412) | Gilles (p. 874) |
|---|---|
| Unlike a private business, which may be able to pass the costs of increased liability on to consumers in the form of increased prices, a police department generally has little control over its pricing input (the government-determined budget) and thus may compensate for damage losses or try to avoid them by reducing production output (its commitment to law enforcement). Further, as Stuntz suggests, adjustments are most likely to affect the communities where searches and seizures most often occur. | Unlike a private business, which may be able to pass the costs of increased liability to its consumers in the form of increased prices, a police department generally has little control over its pricing input (the government-determined budget) and thus may compensate for punitive damages liability by reducing production output (its commitment to law enforcement). This decrease in law enforcement, moreover, could adversely affect the communities where police presence is most needed. |

74.   The first sentence in the above-cited passage is verbatim or direct plagiarism, as it copies and pastes the sentence from Slobogin's article with only one or two changes to individual words. The second sentence, by contrast, is an acceptable paraphrase of Slobogin's second sentence, but it takes an idea that Slobogin (properly)

attributes to Professor William Stuntz and relays this idea without crediting Stuntz at all. That is also plagiarism, as it constitutes the theft of an idea rather than the theft of another's words. *See How to Avoid Plagiarism*, Northwestern University Office of the Provost, http://bit.ly/3XJW3ST. Indeed, it takes considerable chutzpah for Gilles to take this idea from a manuscript *that explicitly credits Stuntz in the body of the article* and then relate that idea without any acknowledgment of Stuntz.

75. Gilles wasn't finished plagiarizing from Slobogin. Later in the article, she borrowed yet another passage without quotation marks or attribution:

| Slobogin (p. 413) | Gilles (p. 875) |
|---|---|
| the political process may well exert a countervailing pressure on municipal governments and their departments. | the political process would exert a countervailing pressure on municipal governments and their departments. |

**N.      Gilles's Plagiarism Of Douglas Colbert**

76. In *Breaking the Code of Silence: Rediscovering "Custom" in Section 1983 Municipal Liability*, 80 B.U. L. Rev. 17 (2000), Gilles used the following text from Douglas L. Colbert, *Bifurcation of Civil Rights Defendants: Undermining Monell in Police Brutality Cases*, 44 Hastings L.J. 499 (1993), without citing Colbert and without placing quotation marks around the copied material:

| Colbert (p. 522) | Gilles (p. 28) |
|---|---|
| The Court . . . found that "Congress, in enacting . . . [the statute], intended to give a broad remedy for violations of federally protected civil rights."[14] Reconstruction legislators had urged that section 1983 be construed "liberally" and with "the largest latitude" that would be consistent with the Act's remedial purpose to "aid [in] the preservation of human liberty and human rights."[15] Applying this liberal construction to the language of section 1983, | [T]he Court found that "Congress, in enacting [the statute], intended to give a broad remedy for violations of federally protected civil rights."[42] The Court also found that the framers of § 1983 had urged that the statute be construed "liberally" and with the "largest latitude" consistent with the Act's remedial purpose to "aid [in] the preservation of human liberty and human rights."[43] Applying this liberal construction to the language of the statute, the Court declared that "it beggars reason |

Case: 1:25-cv-01129 Document #: 1 Filed: 02/01/25 Page 34 of 63 PageID #:34

the Court declared that "it beggars reason to suppose that Congress would have exempted municipalities from suit."[16]

to suppose that Congress would have exempted municipalities from suit."[44]

77. Northwestern University, however, does not and will not care that Gilles has plagiarized to this extent. The university will not take any corrective or disciplinary action against Gilles for any of these transgressions—even though the university would suspend or expel a Northwestern student who engaged in this type of behavior. And the university won't revoke the tenured offer that it made to Gilles earlier this year on account of her academic dishonesty. What matters to Northwestern is that their professors check the proper diversity boxes. Whether their professors observe the requirements of academic integrity is a secondary concern. A white or Asian professor who plagiarized to this extent would never be hired by Northwestern University. But black professors who plagiarize not only get away with it but are awarded lateral appointments over non-black faculty candidates with better credentials, better publication records, and higher standards of integrity.

78. Not only will Northwestern refrain from imposing any sanctions or corrective measures on Gilles, the university will defend Gilles and downplay her misconduct, just as Harvard University does when its black professors are caught plagiarizing. In 2004, Harvard Law Professor Charles Ogletree published a book entitled *All Deliberate Speed: Reflections on the First Half-Century of Brown v. Board of Education*, which ripped off six paragraphs verbatim from legal scholar Jack Balkin without attribution or quotation marks. When Ogletree was caught, he blamed it on his research assistants—as if having research assistants ghost-write your books should be regarded as a mitigating factor rather than an aggravating circumstance. *See* Stephen M. Marks, *Ogletree Faces Discipline for Copying Text*, The Harvard Crimson (September 13, 2024), http://bit.ly/4dyv1ns. The then-President of Harvard, Derek Bok, accepted Ogletree's excuse. *See id.* ("There was no deliberate wrongdoing at all," Bok said.

complaint                                                                 Page 34 of 63

"He marshaled his assistants and parceled out the work and in the process some quotation marks got lost.").[6] Not only was Ogletree not suspended or fired (and no disciplinary action taken against Ogletree was ever disclosed), Harvard has forever immortalized Ogletree by naming a chaired professorship after him. *See* http://bit.ly/3zG3XET. When Claudine Gay was exposed as a serial plagiarist, the Harvard Corporation initially "cleared" her of wrongdoing before eventually forcing her resignation as university president. *See* Jennifer Schuessler and Vimal Patel, *Harvard Clears Its President of 'Research Misconduct' After Plagiarism Charges*, The New York Times (December 12, 2023), http://nyti.ms/3Bn6hB0. Yet Gay still remains on the faculty as a tenured professor, and she has not been disciplined by the university even though the university would surely discipline a Harvard student who engaged in that behavior. *See* Anonymous, *I Vote on Plagiarism Cases at Harvard College. Gay's Getting off Easy.*, Harvard Crimson (December 31, 2023), http://bit.ly/3Y4YReL ("When my peers are found responsible for multiple instances of inadequate citation, they are often suspended for an academic year. When the president of their university is found responsible for the same types of infractions, the fellows of the Corporation 'unanimously stand in support of' her."). This is the typical response that universities deploy whenever the demands of academic integrity conflict with the DEI agenda, and Northwestern will respond in similar fashion.

79. The predictable response will be to claim that Gilles's critics are racists or racially motivated, in the same way that the DEI apologists responded to the attacks on Claudine Gay. *See* Bianca Quilantan, *Harvard governing board, activists say former president was a victim of racism*, Politico (January 2, 2024), http://politi.co/47O4FMW. To preempt this line of attack, we should make clear

---

6. It is hard to imagine a Harvard student (or any university student) escaping suspension or expulsion by blaming his verbatim plagiarism on the fact that he outsourced the drafting of his paper to others.

that there was nothing even remotely approaching plagiarism found in the scholarship of Paul Gowder. Nor was there anything found in Jamelia Morgan's work that resembles the level of plagiarism in Gilles's publications. We also examined the work of Northwestern's non-black law faculty to defeat any claim that black professors are somehow being "targeted" for plagiarism accusations. No one else on Northwestern's tenured or tenure-track faculty has been found to have engaged in extensive plagiarism, apart from one or two isolated or borderline cases. White professors also plagiarize,[7] but the absence of evidence against other members of Northwestern's faculty does nothing to mitigate Gilles's misconduct or imply that Gilles is somehow being singled out because of her race.

### IV. Race and Sex Discrimination On Northwestern's Law Review

80.   The student editors of the Northwestern University Law Review also discriminate on account of race and sex, in violation of Title VI, Title IX, and 42 U.S.C. § 1981.

81.   The student editors of the Northwestern University Law Review give discriminatory preferences to women, racial minorities, homosexuals, and transgender people when selecting their members and editors—a practice that violates the unequivocal commands of Title VI and Title IX. The student editors of the Northwestern University Law Review also give discriminatory preferences to articles written by women, racial minorities, homosexuals, or transgender people, while rejecting far better articles written by white men. This violates not only Title VI and Title IX but also 42 U.S.C. § 1981, because law reviews enter into contracts with the authors of articles that they publish.

---

7.   *See* Daniel J. Hemel & Lauren A.E. Schuker, *Prof Admits to Misusing Source*, The Harvard Crimson (September 27, 2004), http:// bit.ly/3BzMjTO.

82.   On its website, the Northwestern University Law Review claims that it "does not discriminate on the basis of race, ethnicity, religion, socioeconomic background, disability, nationality, sexual orientation, gender orientation and identity, or ideological perspective." *See Diversity and Inclusion*, Northwestern University Law Review, http://bit.ly/3wcxzIx [https://perma.cc/RZC9-QQ2U]. That is a bald-faced lie. The Northwestern University Law Review discriminates on the basis of race, sex, sexual orientation, and gender identity by using affirmative action to select its members, editors, and articles. Rather than choosing its members based on law-school grades and a blind-graded writing competition, the Law Review solicits "personal statements" from student applicants. Students are encouraged to use these personal statements to signal their race, sexual orientation, and gender identity, and the Law Review editors use these personal statements to discriminate against white men and in favor of women, racial minorities, homosexuals, and transgender people.

83.   The Northwestern University Law Review is relying on these "personal statements" in a racially biased and sex-biased manner, in violation of the Supreme Court's instructions in *Students for Fair Admissions*, 600 U.S. at 230–31. A student applicant who is female, a racial minority, or homosexual or transgender and who uses those demographic characteristics to claim that they have overcome adversity or will bring a unique perspective to the law review will be awarded a significant boost in the membership-selection process. But a white male applicant who is neither homosexual nor transgender will never be awarded any type of preference based on their personal statement, even if they claim to have overcome adversity or assert that they will bring a unique perspective to the law review. The personal statements are relied upon solely for the purpose of awarding discriminatory preferences to women, racial minorities, homosexuals, and transgender people who would not have earned a position on the law review with their academic credentials and performance, at the expense of white men who are neither homosexual nor transgender. The Northwestern University Law

Review intends to continue relying on "personal statements" in this biased manner unless it is enjoined by this Court from doing so.

84. The Northwestern University Law Review has also established a position on its editorial board for a "senior equity and inclusion editor," which is currently held by Jazmyne Denman. The purpose of this office is to ensure that women, racial minorities, and homosexual and transgender individuals are given illegal discriminatory preferences over white heterosexual and non-transgender men, both with respect to the selection of student members and editors as well as the selection of articles. Many other law reviews have established similar positions on their editorial board for the purpose of subordinating meritocracy to diversity considerations. The senior equity and inclusion editor on the Northwestern University Law Review oversees and encourages the violations of federal anti-discrimination laws committed by the Northwestern University Law Review.

85. In 2021, the Law Review rejected an application for membership from a white male student who had a first-year grade point average of over 4.0, while accepting female and minority students with much lower first-year grades. If the rejected student with the over 4.0 grade point average had been a woman, racial minority, homosexual, or transgender individual, he would have been accepted for law-review membership. The Law Review will continue these discriminatory and unlawful membership-selection practices until a court enjoins it from doing so.

86. The Law Review also engages in race and sex discrimination when deciding which articles it will publish. The editors of Volume 118, which was published during the 2023–2024 school year, decided that they would publish an entire issue that would consist only of articles written by black women. No articles written by men or by any non-black person would even be considered for publication in that issue. Even the student note published in that issue (Issue 3) was written by a black female who had recently graduated from the law school. Issue 3 does not disclose that only articles

written by black women were considered for publication, making it appear as though the normal selection process was used and that these authors earned their placement in the Northwestern University Law Review by writing better scholarship than the articles that were rejected. The student editors and members on the Law Review were told that this was done intentionally to promote the careers of these black women academics because of their race and sex.

87.  One of the articles that the Northwestern University Law Review published in its black-women-only issue contains numerous instances of plagiarism. *See* Norrinda Brown, *Black Liberty in Emergency*, 118 Nw. U. L. Rev. 691 (2023). Many of these plagiarized passages should have been caught by the student editors who citechecked the articles before publication. Yet the student editors on the Northwestern University Law Review were unable or unwilling to detect this plagiarism in their zeal to meet their equity-and-inclusion goals. Norrinda Brown has also committed extensive plagiarism in her other published works. But the Northwestern University Law Review would prefer to publish articles with plagiarism (and articles written by serial plagiarists) as long as the authors are black women, rather than publish scholarship from members of other demographics who respect and follow the requirements of academic integrity.

88.  The Northwestern University Law Review also requires its members and editors to sign non-disclosure agreements. When FASORP initially used Northwestern over its illegal race and sex preferences in July of 2022, editor-in-chief Dheven Unni sent a missive to the Law Review's membership reminding them of their obligations under the NDAs and emphasizing that the NDAs were adopted in part to shield the Law Review's "selection" practices from disclosure. *See* E-mail from Dheven Unni (attached as Exhibit 5) ("You can also tell anyone who reaches out for information about selection that it is covered by your NDAs! This is part of what those NDAs are in place for, so it's especially important to make sure we're complying with

them right now."); *see also* Non-Disclosure Agreement (attached as Exhibit 6). The Northwestern University Law Review requires its members and editors to sign non-disclosure agreements for the purpose of preventing them from exposing the race and sex preferences that the Law Review uses when selecting its articles, editors, and members.

89.   Unni also instructed the Law Review's membership to use "discretion" in all written communications. *See* Exhibit 5 ("This is also a reminder that, as always, we should exercise our best discretion in our written communications."). This instruction would not be necessary if the Law Review were selecting its articles, editors, and members in a colorblind and sex-neutral fashion.

90.   Finally, Unni disclosed that he and Jazmyne Denman have "repeatedly confirmed" the Law Review's "compliance with all applicable law," thereby waiving any attorney–client privilege that would otherwise attach to these communications between the Law Review and the university's general counsel's office. *See* Exhibit 5 There would be no need for the Law Review to consult with the university's general counsel if it were using colorblind and sex-neutral selection practices. And there would be no need to involve the "senior equity and inclusion editor" in these discussions unless the Law Review was seeking validation for its discriminatory race and sex preferences.

### A.    Norrinda Brown's Plagiarism of Wendy Parmet

91.  In *Black Liberty in Emergency*, 118 Nw. U. L. Rev. 691 (2023), Norrinda Brown copies the following passages from Wendy E. Parmet, *Quarantining the Law of Quarantine: Why Quarantine Law Does Not Reflect Contemporary Constitutional Law*, 9 Wake Forest J. Law & Pol'y 1 (2018), without citing Parmet and without placing the stolen language in quotation marks:

| Parmet (p. 10) | Brown (p. 719) |
|---|---|
| The Court expounded upon this view in 1902 in *Compagnie Francaise de Navigation a Vapeur v. Louisiana State Board of Health*, which rejected both Commerce Clause and due process challenges to a state law that barred all healthy noncontagious immigrants from entering areas of the state in which there was disease.[66] A few years later, while upholding a vaccine mandate in *Jacobson v. Massachusetts*, the Court explained that an individual could be held "in quarantine against his will" on board of such vessel or in a quarantine station, until it be ascertained by inspection, conducted with due diligence, that the danger of the spread of the disease among the community at large has disappeared."[67] | The Court expounded upon its views on quarantine in a 1902 case, *Compagnie Francaise de Navigation a Vapeur v. Louisiana State Board of Health*, in which the Court ultimately rejected both Commerce Clause and Due Process challenges to a state law that prohibited healthy, noncontagious immigrants from entering areas of the state in which there was disease.[188] A few years later, in the course of upholding a vaccine mandate in *Jacobson v. Massachusetts*, the Court first opined that an individual could "be held in quarantine against his will . . . until it be ascertained . . . that the danger of the spread of the disease among the community at large has disappeared."[189] |

| Parmet (p. 9) | Brown (pp. 722) |
|---|---|
| As that court explained, the quarantine was in "practical operation" discriminatory, and the city's purpose was "to enforce it 'with an evil eye and unequal hand,'" in violation of the Fourteenth Amendment.[61] More often courts upheld quarantines even when they were enforced in a disparate manner against vulnerable populations.[62] | [T]he court explained, because the quarantine was in "practical operation" discriminatory, and the city's purpose was only "to enforce it 'with an evil eye and unequal hand,'" in violation of the Fourteenth Amendment. *Jew Ho* is an outlier. Post-*Jew Ho*, more often courts have abjured their authority to review the issuance of quarantines by state actors even when quarantines were enforced in a discriminatory manner against vulnerable populations. |

92.  In *Black Liberty in Emergency*, 118 Nw. U. L. Rev. 691 (2023), Norrinda Brown relies upon the following passage from Wendy E. Parmet, *Quarantining the Law of Quarantine: Why Quarantine Law Does Not Reflect Contemporary Constitutional Law*, 9 Wake Forest J. Law & Pol'y 1 (2018):

| Parmet (pp. 6–7) | Brown (pp. 724–725) |
|---|---|
| These impediments, I argue, have impeded what Pamela Karlan would call the "refinement" of the constitutional law of quarantine: the process by which broad constitutional commands—such as due process—which are applicable to quarantine are developed into "regulatory codes of conduct" that can guide officials in actual cases.[41] By forestalling the refinement of the constitutional law of quarantine, these barriers have effectively quarantined the law of quarantine, separating it from contemporary constitutional constraints on the deprivation of liberty to the detriment not only of those who are quarantined but also the public's health.[42] | Parmet challenged courts to engage in a process "by which broad constitutional commands—such as due process—which are applicable to quarantine" are fleshed out in opinions and "developed into 'regulatory codes of conduct' that can guide officials in actual cases."[230] Parmet argued that forestalling the refinement of the constitutional law of quarantine has effectively separated the law of quarantine from contemporary constitutional constraints on the deprivation of liberty, both to the detriment of those who are quarantined but also the public's health.[231] |

93.    Brown's passage gets off to a good start by acknowledging Parmet by name and quoting from her article. The first sentence in Brown's passage is proper use of Parmet's source material. But in the next sentence, Brown replicates Parmet's words without placing them in quotation marks. That is plagiarism, even though Brown attributes the *idea* to Parmet. Brown is stealing Parmet's words, and that is unacceptable even if the author of the stolen words is cited and acknowledged. *See How to Avoid Plagiarism*, Northwestern University Office of the Provost, http://bit.ly/3XJW3ST. Everything must be phrased entirely in the author's own words or else set aside in quotation marks with proper attribution.

94.    Brown also used this passage from Parmet's work:

| Parmet (p. 12) | Brown (pp. 720) |
|---|---|
| Since *Siegel* and *Reynolds*, only two federal district courts have published opinions relating to the detention of individuals (who were not already prisoners) to prevent the spread of communicable disease. In *Haitian Centers Council v. Sale*, a federal district court ruled | Since 1973, "only two federal district courts have published opinions relating to the detention of individuals (who were not already prisoners) to prevent the spread of communicable disease."[198] In *Haitian Centers Council, Inc. v. Sale*, |

that the detention of HIV-positive Haitian refugees at Guantanamo Bay, was unconstitutional.[77] In *Best v. St. Vincent's Hospital*, a lower court upheld an order requiring the treatment and confinement of a noncompliant TB patient.

a federal district court ruled that the detention of HIV-positive Haitian refugees at Guantanamo Bay was unconstitutional.[199] And in *Best v. St. Vincent's Hospital*, a court dismissed a complaint that challenged a statute permitting the treatment and confinement of a noncompliant tuberculosis patient.

95.     Once again, Brown begins her passage by properly citing and quoting from Parmet's work. After doing that, she steals the next sentence verbatim without quotation marks and without attribution to Parmet. Northwestern University's Office of the Provost describes this form of plagiarism as "insufficient acknowledgement," and denounces it as an "especially reprehensible" form of plagiarism because it is clear that the writer knows the source from which her material came yet steals the material anyway:

> This half-crediting of a source is a common form of plagiarism. It stems either from a desire to credit one's source and copy it too, or from ignorance as to where to footnote. The general rule is to footnote after rather than before your resource material. . . . This example of plagiarism is especially reprehensible because the writer seemingly acknowledges his source—but not enough.

*How to Avoid Plagiarism*, Northwestern University Office of the Provost, http://bit.ly/3XJW3ST.

96.     What is notable about these episodes is that Northwestern's student editors failed to catch any of these stolen passages when reviewing Brown's citations of Parmet. Unlike Gilles's plagiarism, which does not cite the source of the stolen language, Brown would cite the very pages of Parmet's article that she was stealing from. Yet the student citecheckers either failed to notice the thefts or saw nothing problematic with Brown's plagiarism.

**B.  Norrinda Brown's Plagiarism of Lawrence Gostin et al.**

97.  In *Black Liberty in Emergency*, 118 Nw. U. L. Rev. 691 (2023), Norrinda Brown steals the following passage from Lawrence O. Gostin et al., *The Law and the Public's Health: A Study of Infectious Disease Law in the United States*, 99 Colum. L. Rev. 59, 119 (1999), without citing Gostin et al. and without placing the stolen language in quotation marks:

| Gostin et al. (p. 119) | Brown (p. 724 n.224) |
|---|---|
| Courts have reasoned that little difference exists between loss of liberty for mental health purposes and loss of liberty for public health purposes. | [C]ourts have reasoned that little difference exists between loss of liberty for mental health purposes and loss of liberty for public health purposes. |

98.  It is noteworthy that this stolen passage from Gostin et al. *appears in quotation marks*—and with proper attribution—in the Wendy Parmet article that Brown plagiarized from. *See* Wendy E. Parmet, *Quarantining the Law of Quarantine: Why Quarantine Law Does Not Reflect Contemporary Constitutional Law*, 9 Wake Forest J. Law & Pol'y 1, 15 (2018) ("'[C]ourts have reasoned that little difference exists between loss of liberty for mental health purposes and loss of liberty for public health purposes'" (quoting Lawrence O. Gostin et al., *The Law and the Public's Health: A Study of Infectious Disease Law in the United States*, 99 Colum. L. Rev. 59, 119 (1999)). Brown apparently decided that she could help herself to that properly attributed quote in Parmet's article by dropping the quotation marks and passing off the sentence as her own.

**C.  Norrinda Brown's Plagiarism of Noah Smith-Drelich**

99.  In *Black Liberty in Emergency*, 118 Nw. U. L. Rev. 691 (2023), Norrinda Brown copies the following passage from Noah Smith-Drelich, *The Constitutional Right to Travel Under Quarantine*, 95 S. Cal. L. Rev. 1367 (2021). Although Brown cites Smith-Drelich and acknowledges him in her text, she does not place the stolen language in quotation marks. This is another theft that Northwestern's student

citecheckers should have caught, as the source material is directly cited in Brown's article:

| Smith-Drelich (p. 1402) | Brown (p. 728) |
| --- | --- |
| This is particularly true if, as numerous lower courts have held, the deferential Jacobson approach is effectively indifferent to issues of overbreadth. | Meeting the low *Jacobson* standard is particularly likely, Smith-Drelich argues, if, as numerous lower courts have held, the deferential *Jacobson* approach is effectively indifferent to issues of overbreadth.[261] |

**D. Norrinda Brown's Plagiarism of Monica Bell**

100. In *Black Liberty in Emergency*, 118 Nw. U. L. Rev. 691 (2023), Norrinda Brown copies the following passage from Monica Bell, *Police Reform and the Dismantling of Legal Estrangement*, 126 Yale L.J. 2054 (2017). Although Brown cites Bell and quotes extensively from her, she does not place the stolen language in quotation marks. Brown had already quoted extensively from Bell in the paragraph in which this stolen sentence appears, so it appears as though Brown omitted the quotation marks to avoid having the entire paragraph consist of quoted language. This is another theft that Northwestern's student citecheckers should have caught, as the source material is directly cited in Brown's article:

| Bell (p. 2087) | Brown (p. 737) |
| --- | --- |
| From a robust legal estrangement perspective, the law's purpose is the creation and maintenance of social bonds. | From a legal estrangement perspective, the law's purpose is the creation and maintenance of social bonds. |

101. There is even more plagiarism than this in Norrinda Brown's *Black Liberty in Emergency*, 118 Nw. U. L. Rev. 691 (2023). But this is enough to provide a sample of the Northwestern University Law Review's indifference toward academic dishonesty committed by authors from preferred demographic groups—as well as its inability or unwillingness to detect plagiarism that a conscientious citechecker should have noticed. The Northwestern University Law Review and its editors are more concerned

with giving illegal racial preferences to black female authors than ensuring that their journal's publications meet basic standards of academic integrity.

102. The Northwestern University Law Review discriminates on account of race and sex even apart from Issue 3 of Volume 118, and it consistently gives discriminatory preferences to articles written by women, racial minorities, homosexuals, or transgender people over better articles written by white men who are neither homosexual nor transgender. These discriminatory article-selection practices are overseen and egged on by the Law Review's senior equity and inclusion editor, a position that was created and exists for the very purpose of elevating submissions from authors with preferred demographic traits over better scholarship written by white men. The Law Review will continue these discriminatory and unlawful article-selection practices until a court enjoins it from doing so.

## IV. FASORP

103. Plaintiff FASORP is a voluntary membership organization founded in 2018. FASORP seeks to restore meritocracy in academia and eliminate the corrupt and unlawful race and sex preferences that subordinate academic merit to so-called diversity considerations.

104. FASORP has members who are ready and able to apply for entry-level and lateral faculty positions at Northwestern University's law school. FASORP also has members who have submitted articles to the Northwestern University Law Review, who are ready and able to submit articles to the Northwestern University Law Review, and who intend to submit their future scholarship to the Northwestern University Law Review.

105. Individual A is a member of FASORP. He is a tenure-track law professor at an ABA-accredited law school and holds a J.D. and a Ph.D. in political science. Individual A is a white man and is neither homosexual nor transgender.

106. Individual A stands able and ready to apply for a faculty appointment at Northwestern University's law school. *See Carney v. Adams*, 592 U.S. 53, 60 (2020); *Gratz v. Bollinger*, 539 U.S. 244, 261 (2003); *Northeast Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993). But the pervasive and ongoing use of race and sex preferences at Northwestern prevents Individual A from competing with other applicants for faculty positions on an equal basis. Specifically, Individual A is unable to compete on an equal basis with faculty candidates who are women, racial minorities, homosexuals, or individuals who engage in gender-nonconforming behavior or identify with a gender that departs from their biological sex. This inflicts injury in fact. *See Gratz*, 539 U.S. at 261–62; *Jacksonville*, 508 U.S. at 666.

107. Individual B is a member of FASORP. He is a tenured law professor at an ABA-accredited law school. Individual B is a white man and is neither homosexual nor transgender.

108. Individual B stands able and ready to apply for a faculty appointment at Northwestern University's law school. *See Carney*, 592 U.S. at 60; *Gratz*, 539 U.S. at 261; *Jacksonville*, 508 U.S. at 666. But the pervasive and ongoing use of race and sex preferences at Northwestern prevents Individual B from competing with other applicants for faculty positions on an equal basis. Specifically, Individual B is unable to compete on an equal basis with faculty candidates who are women, racial minorities, homosexuals, or individuals who engage in gender-nonconforming behavior or identify with a gender that departs from their biological sex. This inflicts injury in fact. *See Gratz*, 539 U.S. at 261–62; *Jacksonville*, 508 U.S. at 666.

109. Individual C is a member of FASORP. He is a tenured law professor at an ABA-accredited law school. Individual C is a white man and is neither homosexual nor transgender.

110. Individual C stands able and ready to apply for a faculty appointment at Northwestern University's law school. *See Carney*, 592 U.S. at 60; *Gratz*, 539 U.S. at 261; *Jacksonville*, 508 U.S. at 666. But the pervasive and ongoing use of race and sex preferences at Northwestern prevents Individual C from competing with other applicants for faculty positions on an equal basis. Specifically, Individual C is unable to compete on an equal basis with faculty candidates who are women, racial minorities, homosexuals, or individuals who engage in gender-nonconforming behavior or identify with a gender that departs from their biological sex. This inflicts injury in fact. *See Gratz*, 539 U.S. at 261–62; *Jacksonville*, 508 U.S. at 666.

111. All of these Article III injuries are fairly traceable to the allegedly unlawful conduct of defendants Northwestern University, as well as defendants Hari Osofsky, Sarah Lawsky, Janice Nadler, and Daniel Rodriguez, who are discriminating on account of race and sex in violation of 42 U.S.C. § 1981, Title VI, Title VII, and Title IX. And all of these injuries will be redressed by the requested relief, which will enjoin Northwestern from continuing these discriminatory policies and require it to adopt colorblind and sex-neutral faculty-hiring practices.

112. Individuals A and C previously applied for tenure-track positions at Northwestern University School of Law when they submitted their applications to the Faculty Appointments Register (FAR) as entry-level candidates.

113. Now that Individuals A, B, and C currently hold law-school faculty appointments, they can seek appointments to Northwestern and other law schools only as lateral candidates. Lateral candidates who apply for law-school faculty appointments do not submit documents or go through a formalized process; they instead inform friends or acquaintances on the faculty of their interest in seeking a position. Individuals A and C have already informed at least one person on Northwestern's law faculty of their interest in a lateral faculty appointment, and they intend to continue doing so

each year until they receive a faculty appointment at Northwestern. The most common form of lateral recruiting is driven not by the interested prospective lateral but by the recruiting school. To generate interest from a school, a lateral candidate needs to convince intermediaries to convince the appointments committee to recruit him.

114. Individual A is qualified and meets all the qualifications for a tenure-track appointment to Northwestern University School of Law. He has published more than 15 scholarly articles and one book.

115. Individual B is qualified and meets all the qualifications for a tenured appointment to Northwestern University School of Law. He has published more than 30 scholarly articles and has more than 20 years of experience as a scholar and teacher. He has also served as a visiting professor at a top-five law school.

116. Individual C is qualified and meets all the qualifications for a tenured appointment to Northwestern University School of Law. He has published more than 50 scholarly articles or book chapters and one book. He has more than 20 years of experience as a scholar and teacher. He has also served as a visiting professor at a top-five law school.

117. Individuals A, B, and C have submitted articles to the Northwestern University Law Review in the past and stand able and ready to submit additional manuscripts to the Northwestern University Law Review for publication in future volumes. *See Carney*, 592 U.S. at 60; *Gratz*, 539 U.S. at 261; *Jacksonville*, 508 U.S. at 666. But the pervasive and ongoing use of race and sex preferences at the Northwestern University Law Review prevents Individuals A, B, and C from competing with other authors who submit articles to the law review on an equal basis. Specifically, Individuals A, B, and C are unable to compete on an equal basis with authors who are women, racial minorities, homosexuals, or individuals who engage in gender-nonconforming behavior or identify with a gender that departs from their biological sex. This inflicts injury in fact. *See Gratz*, 539 U.S. at 261; *Jacksonville*, 508 U.S. at 666.

118. Individuals A, B, and C will also suffer injury in fact from Northwestern University Law Review's decisions to subordinate academic merit and deploy race and sex preferences when selecting the student members and editors who determine whether their articles will be published, as their submissions will be judged by students with lower academic credentials and abilities. In addition, students whose membership on the law review is attributable to race and sex preferences are more likely to discriminate against articles written by white, heterosexual men who do not engage in gender non-conforming behavior than students who earned their place on the law review through their academic performance. All of this inflicts injury in fact.

119. Individual A has submitted at least one previous manuscript to the Northwestern University Law Review and his previous submissions were all rejected. Individual A is currently working on an article that he intends to submit to the Northwestern University Law Review in either February or August of 2025. Law reviews consider and accept submissions during two "cycles" that occur each year—one in February and one in August. Individual A will submit additional manuscripts to the Northwestern University Law Review in the future, and will continue doing so for as long as he remains a law professor.

120. Individual B has submitted several previous manuscripts to the Northwestern University Law Review and the vast majority were rejected. Individual B is currently working on an article that he intends to submit to the Northwestern University Law Review in either February or August of 2025. Law reviews consider and accept submissions during two "cycles" that occur each year—one in February and one in August. Individual B will submit additional manuscripts to the Northwestern University Law Review in the future, and will continue doing so for as long as he remains a law professor.

121. Individual C has submitted at least seven manuscripts to the Northwestern University Law Review, all of which were rejected. Individual C is currently working

on two articles that he plans to submit to student-edited law reviews when completed, including the Northwestern University Law Review, and he plans to submit one of those articles in August of 2025 and the other in February of 2026.

122. All of these Article III injuries are fairly traceable to the allegedly unlawful conduct of defendants Northwestern University, as well as defendants Dheven Unni and Jazmyne Denman, who are discriminating on account of race and sex in violation of 42 U.S.C. § 1981, Title VI, and Title IX. And all of these injuries will be redressed by the requested relief, which will enjoin the Northwestern University Law Review and its editors from continuing these discriminatory policies and require them to adopt colorblind and sex-neutral article-selection practices.

123. FASORP has additional members who are suffering injuries in fact similar or identical to those suffered by Individuals A, B, and C. These individuals are only a representative sample and not an exclusive list of the members of FASORP who would have standing to sue the defendants if they sued as individuals.

124. The interests that FASORP seeks to protect in the litigation are germane to the organization's purpose. FASORP seeks to restore meritocracy at American universities by eliminating the use of race and sex preferences, as stated on its website. *See* FASORP, https://fasorp.org.

125. Neither the claims asserted by FASORP nor the relief requested in this litigation requires the participation of the organization's individual members.

## IV. Legal Background

126. 42 U.S.C. § 1981 prohibits Northwestern from engaging in racial discrimination in the making and enforcement of contracts, which include contracts between Northwestern University and its faculty members, as well as contracts between the Northwestern University Law Review and the authors of the articles that it publishes.

127. Title VI, Title VII, and Title IX prohibit Northwestern from discriminating on the basis of race or sex. Title VI states that "No person in the United States shall,

on the ground of race, color, or national origin, . . . be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Title VII forbids an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). And Title IX states that "No person in the United States shall, on the basis of sex, . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance," subject to exceptions not relevant here. 20 U.S.C. § 1681(a).

128. Northwestern receives federal financial assistance. It is therefore subject to Title VI's and Title IX's prohibitions.

129. The U.S. Court of Appeals for the Seventh Circuit has held that a Title VI plaintiff "'must be the intended beneficiary of, an applicant for, or a participant in a federally funded program.'" *Doe v. St. Joseph's Hospital of Fort Wayne*, 788 F.2d 411, 418–20 (7th Cir. 1986) (quoting *Simpson v. Reynolds Metal Co.*, 629 F.2d 1226, 1235 (7th Cir. 1980)). FASORP and its members qualify as permissible Title VI plaintiffs under each of these three criteria.

130. Individuals A, B, and C are each "intended beneficiaries" of federally funded programs because they serve as faculty members at universities that receive federal funds. University faculty are intended beneficiaries of the research grants that the federal government provides to universities. University faculty are also intended beneficiaries of the grants and loans that the federal government provides to university students, even though students are the primary beneficiaries of these programs, as federally backed grants and loans enable faculty to teach and influence students who would otherwise be unable to attend their university.

131. Individuals A, B, and C are also "applicants for . . . a federally funded program" because they have made known their interest in a lateral faculty appointment

at Northwestern, which is how a current faculty member "applies" for appointment at another law school. *See* paragraph 113, *supra*. Northwestern University is a "federally funded program," as it receives federal funds, and Individuals A, B, and C are "applicants for" that federally funded program.

132. Individuals A, B, and C are also "participants in . . . a federally funded program" because they currently serve as faculty members at universities that receive federal funds.

133. FASORP is a membership organization composed of individuals who are "intended beneficiaries" of federally funded programs because the organization comprises both university faculty members and students, all of whom are "intended beneficiaries" of federal programs that provide research grants to universities as well as federally subsidized grants and loans to students.

134. The Seventh Circuit has also held that "'Title VI does not provide a judicial remedy for employment discrimination by institutions receiving federal funds unless (1) providing employment is a primary objective of the federal aid, or (2) discrimination in employment necessarily causes discrimination against the primary beneficiaries of the federal aid.'" *Ahern v. Board of Education of City of Chicago*, 133 F.3d 975, 978 (7th Cir. 1998) (quoting *Trageser v. Libbie Rehabilitation Center, Inc.,* 590 F.2d 87, 89 (4th Cir. 1978)). Providing employment is a "primary objective" of the research grants that the federal government provides to institutions such as Northwestern, as federal research money is used to employ university faculty on research tasks that the federal government wishes to fund. In addition, Northwestern's discriminatory faculty-hiring practices "necessarily cause[] discrimination against the primary beneficiaries of the federal aid," as university faculty are "primary beneficiaries" of federal research grants as well as the subsidized grants and loans that the federal government provides to university students.

135. Federal regulations interpreting Title VI also require Northwestern to re-frain from any employment practice that "tends, on the ground of race, color, or national origin, to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination" under any federally funded program, regard-less of whether a "primary objective" of the federal financial assistance is "to provide employment," to the extent "necessary to assure equality of opportunity to, and non-discriminatory treatment of, beneficiaries":

> Where a primary objective of the Federal financial assistance is not to provide employment, but discrimination on the ground of race, color, or national origin in the employment practices of the recipient or other persons subject to the regulation tends, on the ground of race, color, or national origin, to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination under any program to which this regulation applies, the foregoing provisions of this paragraph (c) shall apply to the employment practices of the recip-ient or other persons subject to the regulation, to the extent necessary to assure equality of opportunity to, and nondiscriminatory treatment of, beneficiaries.

34 C.F.R. § 100.3(c)(3). FASORP and its members, including Individuals A, B, and C, are "beneficiaries" of the federal financial assistance provided to universities, so they are entitled to "equal opportunity" and "nondiscriminatory treatment" on ac-count of race, color, and national origin under the terms of Title VI and 34 C.F.R. § 100.3(c)(3). *See also Cieslik v. Board of Education of City of Chicago*, No. 1:19-CV-05553, 2021 WL 1172575, at *3 (N.D. Ill. Mar. 29, 2021) ("Where . . . the primary objective of federal assistance is not employment, Title VI can still provide a cause of action against an employment practice if the employment discrimination necessarily causes discrimination against the primary beneficiaries of the aid." (citing *Ahern v. Board of Education of City of Chicago*, 133 F.3d 975, 978 (7th Cir. 1998)).

136. The Seventh Circuit has also held that Title IX should not be used to litigate employment-discrimination claims if Title VII would provide an equivalent remedy.

*See Waid v. Merrill Area Public Schools*, 91 F.3d 857, 861–63 (7th Cir. 1996); *Agbefe*, 538 F. Supp. 3d at 840. But FASORP is seeking a remedy under Title IX that is unavailable under Title VII: an injunction that restrains Northwestern University from accepting any federal funds until it proves to the satisfaction of this Court that it has: (a) eliminated every vestige of race and sex preferences in its faculty hiring and selection of law-review articles, members, and editors; and (b) has adopted and implemented colorblind and sex-neutral practices with respect to its faculty hiring and the selection of law-review articles, members, and editors. See paragraph 161(*l*), *infra*.

137. Faculty hiring decisions are, like college admissions decisions, "zero-sum." *Students for Fair Admissions*, 600 U.S. at 218. Northwestern considers race and sex positive factors for some faculty applicants and therefore necessarily negative factors for others. *See id*.

138. FASORP brings this suit under Title VI, Title IX, 42 U.S.C. § 1981, and any other law that might supply a cause of action for the requested relief.

## CLAIMS

### Count One: Violation of Title VI (42 U.S.C. § 2000d)

139. Northwestern University and defendants Hari Osofsky, Sarah Lawsky, Janice Nadler, and Daniel Rodriguez are violating Title VI by discriminating in favor of minority faculty candidates and against whites.

140. Northwestern University and defendants Dheven Unni and Jazmyne Denman are violating Title VI by discriminating in favor of racial minorities and against whites when selecting articles for publication in the Northwestern University Law Review.

141. Northwestern University and its law school and law review are all "program[s] or activit[ies]" that "receive[] Federal financial assistance" within the meaning of Title VI.

142. FASORP therefore seeks declaratory and injunctive relief that prohibits defendant Northwestern University, along with defendants Hari Osofsky, Sarah Lawsky, Janice Nadler, and Daniel Rodriguez, their successors in office, and anyone in active concert or participation with them, from discriminating on account of race in the appointment, promotion, and compensation of faculty, and that compels Northwestern University and its officers and employees to appoint, promote, and compensate their faculty in a colorblind manner.

143. FASORP also seeks declaratory and injunctive relief that prohibits defendant Northwestern University, along with defendants Dheven Unni and Jazmyne Denman, their successors in office, and anyone in active concert or participation with them, from discriminating on account of race in the Northwestern University Law Review's selection of members, editors, and articles, and that compels them to select the Law Review's members, editors, and articles in a colorblind manner.

144. FASORP seeks this relief under the implied right of action that the Supreme Court has recognized to enforce Title VI, *see Cannon v. University of Chicago*, 441 U.S. 677, 703 (1979), and any other law that might supply a cause of action for the requested relief.

### Count Two: Violation of Title IX (20 U.S.C. § 1681(a))

145. Northwestern University and defendants Hari Osofsky, Sarah Lawsky, Janice Nadler, and Daniel Rodriguez are violating Title IX by discriminating in favor of female faculty candidates and against men. They are also violating Title IX by discriminating in favor of homosexual or transgender faculty candidates and against faculty candidates who are heterosexual and identify and act in accordance with their biological sex. *See Bostock v. Clayton County*, 590 U.S. 644, 669 (2020).

146. Northwestern University and defendants Dheven Unni and Jazmyne Denman are further violating Title IX by discriminating in favor of female, homosexual,

and transgender authors when selecting articles for publication in the Northwestern University Law Review.

147. Northwestern University and its law school and law review are all "education program[s] or activit[ies]" that "receive[] Federal financial assistance" within the meaning of Title VI.

148. FASORP therefore seeks declaratory and injunctive relief that prohibits defendant Northwestern University, along with defendants Hari Osofsky, Sarah Lawsky, Janice Nadler, and Daniel Rodriguez, their successors in office, and anyone in active concert or participation with them, from discriminating on account of sex in the appointment, promotion, and compensation of faculty, and that compels Northwestern University and its officers and employees to appoint, promote, and compensate their faculty in a sex-neutral manner. The Court should also restrain these defendants from discriminating in favor of homosexual or transgender faculty or faculty candidates, which constitutes discrimination on the basis of sex. *See Bostock v. Clayton County*, 590 U.S. 644 (2020).

149. FASORP also seeks declaratory and injunctive relief that prohibits defendant Northwestern University, along with defendants Dheven Unni and Jazmyne Denman, their successors in office, and anyone in active concert or participation with them, from discriminating on account of race in the Northwestern University Law Review's selection of members, editors, and articles. The Court should also restrain these defendants from discriminating in favor of homosexual or transgender candidates for law-review membership, editorial positions, or article placement, which constitutes discrimination on the basis of sex. *See Bostock v. Clayton County*, 590 U.S. 644 (2020).

150. FASORP seeks this relief under the implied right of action that the Supreme Court has recognized to enforce Title IX, *see Cannon v. University of Chicago*, 441 U.S. 677, 703 (1979), and any other law that might supply a cause of action for the requested relief.

### Count Three: Violation of 42 U.S.C. § 1981

151. 42 U.S.C. § 1981(a) guarantees individuals the same right to make and enforce contracts without regard to race. *See* 42 U.S.C. § 1981(a) ("All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens").

152. 42 U.S.C. § 1981(a) protects whites on the same terms that it protects "underrepresented" racial minorities. *See McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 295 (1976) ("[T]he Act was meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race.").

153. Northwestern University and defendants Hari Osofsky, Sarah Lawsky, Janice Nadler, and Daniel Rodriguez are violating 42 U.S.C. § 1981(a) by discriminating in favor of racial minorities and against whites in faculty hiring. White faculty candidates do not enjoy the "same right . . . to make and enforce contracts" that minority faculty candidates enjoy at Northwestern University.

154. Northwestern University and defendants Dheven Unni and Jazmyne Denman are also violating 42 U.S.C. § 1981(a) by discriminating in favor of racial minorities and against whites when selecting articles for publication in the Northwestern University Law Review. White authors who submit articles to the Northwestern University Law Review do not enjoy the "same right . . . to make and enforce contracts" that minority authors who submit articles to the Northwestern University Law Review enjoy.

155. FASORP therefore seeks declaratory and injunctive relief that prohibits defendant Northwestern University, along with defendants Hari Osofsky, Sarah Lawsky, Janice Nadler, and Daniel Rodriguez, their successors in office, and anyone in active concert or participation with them, from discriminating on account of race in the

appointment, promotion, and compensation of faculty, and that compels Northwestern University and its officers and employees to appoint, promote, and compensate their faculty in a colorblind manner.

156. FASORP also seeks declaratory and injunctive relief that prohibits defendant Northwestern University, along with defendants Dheven Unni and Jazmyne Denman, their successors in office, and anyone in active concert or participation with them, from discriminating on account of race in the Northwestern University Law Review's selection of members, editors, and articles.

157. FASORP seeks this relief under the implied right of action that the Supreme Court has recognized to enforce 42 U.S.C. § 1981(a), and any other law that might supply a cause of action for the requested relief. *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459–60 (1975).

### Count Four: Violation of Title VII (42 U.S.C. § 2000e-2)

158. Northwestern University and defendants Hari Osofsky, Sarah Lawsky, Janice Nadler, and Daniel Rodriguez are violating Title VII by discriminating in favor of females, racial minorities, homosexuals, and transgender persons and against white men who are neither heterosexual nor transgender in their faculty-hiring decisions and in the compensation offered or provided to faculty hires and faculty members.

159. FASORP therefore seeks declaratory and injunctive relief that prohibits defendant Northwestern University, along with defendants Hari Osofsky, Sarah Lawsky, Janice Nadler, and Daniel Rodriguez, their successors in office, and anyone in active concert or participation with them, from discriminating on account of race or sex in the appointment, promotion, and compensation of faculty, and that compels Northwestern University and its officers and employees to appoint, promote, and compensate their faculty in a colorblind and sex-neutral manner. The Court should also restrain these defendants from discriminating in favor of homosexual or transgender

faculty or faculty candidates, which constitutes discrimination on the basis of sex. *See Bostock v. Clayton County*, 590 U.S. 644 (2020).

160. The EEOC issued FASORP a right-to-sue letter on December 26, 2024, which authorizes FASORP to seek this relief under the express right of action that Congress has established to enforce Title VII. *See* Exhibit 1; 42 U.S.C. § 2000e-5(f)(1) (requiring issuance of a right-to-sue letter before a private litigant can bring a Title VII claim). FASORP also asserts its Title VII claim under any other law that might supply a cause of action for the requested relief.

## DEMAND FOR RELIEF

161. FASORP respectfully requests that the court:

   a.  declare that defendants Northwestern University, Hari Osofsky, Sarah Lawsky, Janice Nadler, and Daniel Rodriguez are violating Title VI, Title VII, Title IX, and 42 U.S.C. § 1981 by discriminating in favor of women, racial minorities, homosexuals, and transgender people and against white heterosexual and non-transgender men in the appointment of faculty;

   b.  declare that defendants Northwestern University, Dheven Unni, and Jazmyne Denman are violating Title VI, Title IX, and 42 U.S.C. § 1981 by discriminating in favor of women, racial minorities, homosexuals, and transgender people and against white heterosexual and non-transgender men in the selection of articles, editors, and members for the Northwestern University Law Review;

   c.  permanently enjoin defendants Northwestern University, Hari Osofsky, Sarah Lawsky, Janice Nadler, and Daniel Rodriguez, their successors in office, and anyone in concert or participation with them, from

considering race, sex, sexual orientation, or gender identity in the appointment, promotion, retention, or compensation of its faculty;

d. permanently enjoin defendants Northwestern University, Hari Osofsky, Sarah Lawsky, Janice Nadler, and Daniel Rodriguez, their successors in office, and anyone in concert or participation with them, from soliciting any information about a faculty candidate's race, sex, sexual orientation, or gender identity;

e. permanently enjoin defendant Northwestern University from allowing defendants Sarah Lawsky, Janice Nadler or Daniel Rodriguez to vote upon or influence faculty-hiring decisions at the university;

f. permanently enjoin defendants Northwestern University, Dheven Unni, and Jazmyne Denman, their successors in office, and anyone in concert or participation with them, from considering race, sex, sexual orientation, or gender identity in the selection of articles, editors, and members for the Northwestern University Law Review;

g. permanently enjoin defendants Northwestern University, Dheven Unni, and Jazmyne Denman, their successors in office, and anyone in concert or participation with them, from soliciting any information about the race, sex, sexual orientation, or gender identity of any person seeking or applying for authorship, membership, or an editorial position in the Northwestern University Law Review;

h. order Northwestern University to establish a new faculty-selection policy that is based entirely on academic and scholarly merit and that explicitly disavows any consideration of race, sex, sexual orientation, or gender identity or expression, and to submit that revised policy to this Court for its review and approval within 30 days of judgment;

i.    order the Northwestern University Law Review to establish new policies for selecting its articles, editors, and members that are based entirely on academic and scholarly merit and that explicitly disavows any consideration of race, sex, sexual orientation, or gender identity or expression, and to submit that revised policy to this Court for its review and approval within 30 days of judgment;

j.    appoint a court monitor to oversee all decisions relating to the appointment, promotion, and compensation of faculty at Northwestern University, as well as all decisions relating to the Northwestern University Law Review's selection of articles, editors, and members, to ensure that these decisions are free from race and sex discrimination;

k.    appoint a court monitor to oversee all diversity offices at Northwestern University to ensure that they do not aid or abet violations of the nation's civil-rights laws;

l.    enjoin defendant Northwestern University from accepting any federal funds until the court monitor certifies that Northwestern University has: (1) eliminated every vestige of race and sex preferences in its faculty hiring and selection of law-review articles, members, and editors; and (2) has adopted and implemented colorblind and sex-neutral practices with respect to its faculty hiring and the selection of law-review articles, members, and editors;

m.    award costs and attorneys' fees;

n.    grant all other relief that the Court deems just, proper, or equitable.

Respectfully submitted.

_/s/ Jonathan F. Mitchell_

Judd E. Stone II*
Christopher D. Hilton*
Ari Cuenin*
Stone | Hilton PLLC
1115 West Slaughter Lane
Austin, Texas 78748
(737) 465-3897 (phone)
judd@stonehilton.com
chris@stonehilton.com
ari@stonehilton.com

Jonathan F. Mitchell
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

Reed Rubinstein*
Ryan Giannetti*
America First Legal Foundation
611 Pennsylvania Avenue SE #231
Washington, DC 20003
(202) 964-3721 (phone)
reed.rubinstein@aflegal.org
ryan.giannetti@aflegal.org

* *pro hac vice* application pending

Dated: January 31, 2025

*Counsel for Plaintiff*