UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FACULTY, ALUMNI, AND STUDENTS OPPOSED TO RACIAL PREFERENCES, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 25 C 1129 |
| | ) | Judge Sara L. Ellis |
| NORTHWESTERN UNIVERSITY, *et al.*, | ) ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Plaintiff Faculty, Alumni, and Students Opposed to Racial Preferences ("FASORP") is a "voluntary, unincorporated, non-profit membership organization formed for the purpose of restoring meritocracy in academia and fighting race and sex preferences that subordinate academic merit to so-called diversity considerations." Doc. 1 ¶ 3. On February 1, 2025, FASORP filed this lawsuit against Defendants Hari M. Osofsky, the dean of Northwestern University School of Law ("Northwestern Law"); Sarah Lawsky, a professor at Northwestern Law; Janice Nadler, a professor at Northwestern Law; Daniel Rodriguez, a professor and former dean at Northwestern Law; Dheven Unni, the editor in chief of Northwestern University Law Review ("NLR"); Jazmyne Denman, the senior equity and inclusion editor of NLR (collectively, the "Individual Defendants"); and Northwestern University. FASORP alleges that Defendants discriminate against heterosexual, cisgender white men during Northwestern Law's entry-level and lateral faculty hiring processes and NLR's selection of members, editors, and articles. FASORP asserts claims for (1) violations of Title VI (42 U.S.C. § 2000d); (2) violations of Title

IX (20 U.S.C. § 1681(a)); (3) violations of 42 U.S.C. § 1981; and (4) violations of Title VII (42 U.S.C. § 2000e-2).[1]

Defendants now move to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The Court holds that, because FASORP has failed to identify any members who would have standing in their own right to challenge Northwestern Law's entry-level faculty hiring process or NLR's selection of members, editors, and articles, FASORP does not have associational standing to challenge these processes. Additionally, although FASORP seeks injunctive relief regarding Northwestern Law's faculty promotion, retention, and compensation policies or practices, FASORP does not allege that any of its members have standing to challenge these processes. The Court therefore dismisses FASORP's claims to the extent that they challenge these processes.

With respect to Northwestern Law's lateral faculty hiring process, the Court concludes that FASORP has failed to state any cognizable, facially plausible claims. Starting with the Title VI claim, Title VI does not provide a judicial remedy for employment discrimination by institutions receiving federal funds unless (1) providing employment is a primary objective of the federal aid, or (2) discrimination in employment necessarily causes discrimination against the primary beneficiaries of the federal aid. Because FASORP has failed to plausibly allege that either of these exceptions apply here, the Court dismisses the Title VI lateral faculty hiring claim. Further, in light of FASORP's concession that its Title IX hiring claim cannot proceed given the holding of *Waid v. Merrill Area Public Schools*, 91 F.3d 857, 861–63 (7th Cir. 1996), the Court dismisses the Title IX lateral faculty hiring claim. Finally, the Title VII and Section

---

[1] In 2024, FASORP filed a similar case challenging Northwestern Law's entry-level and lateral faculty hiring processes and NLR's selection of members, editors, and articles. *FASORP v. Northwestern Univ., et al.,* No. 24-cv-5558 (N.D. Ill.) (the "2024 Case"). After the defendants filed a motion to dismiss, FASORP requested leave to amend its complaint and add a Title VII claim. Before the Court could rule on either motion, FASORP voluntarily dismissed the 2024 Case and filed the instant complaint.

1981 claims both require FASORP to plausibly allege that Defendants instituted a specific adverse employment action against at least one of its members, yet FASORP alleges only that its members will face a competitive disadvantage during the hiring process.  And FASORP does not dispute that it failed to allege but-for causation, another requirement for the Section 1981 claim. The Court therefore dismisses the Title VII and Section 1981 lateral faculty hiring claims.

**BACKGROUND[2]**

### I.      Faculty Hiring at Northwestern Law

#### A.      General Overview of Hiring Processes

Northwestern Law utilizes two different processes for faculty hiring, depending on whether the applicant already holds a law school faculty appointment elsewhere.  Entry-level applicants submit applications through the "Faculty Appointments Register," whereas lateral candidates "do not submit documents or go through a formalized process."  Doc. 1 ¶ 113. Instead, lateral candidates "inform friends or acquaintances on the faculty of their interest in seeking a position."  *Id.*  This is because "[t]he most common form of lateral recruiting is driven not by the interested prospective lateral but by the recruiting school" and lateral candidates "generate interest from a school" by "convinc[ing] intermediaries to convince the appointments committee to recruit him."  *Id.*

The allegations in the complaint provide very few details about the process by which Northwestern Law evaluates these candidates, however.  The complaint briefly discusses an

---

[2] The Court takes the facts in the background section from FASORP's complaint and exhibits attached thereto and presumes them to be true for the purpose of resolving Defendants' motion to dismiss.  *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013).  Although the Court normally cannot consider extrinsic evidence without converting a motion to dismiss into one for summary judgment, *Jackson v. Curry*, 888 F.3d 259, 263 (7th Cir. 2018), the Court may consider "documents that are central to the complaint and are referred to in it" in ruling on a motion to dismiss, *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).  The Court "may also take judicial notice of matters of public record."  *Orgone Cap. III, LLC v. Daubenspeck*, 912 F.3d 1039, 1043–44 (7th Cir. 2019).

appointments committee, which "has complete control over which candidates will be brought in for interviews or voted upon by the faculty." *Id.* ¶ 45. The complaint suggests that there may be separate appointment committees for lateral and entry-level applicants. *See id.* ¶ 38 (discussing "lateral-appointments committee"). The dean of Northwestern Law chooses the committee members on an annual basis "with no formal input from the faculty." *Id.* The complaint does not explain the interview or voting processes with any level of specificity.

### B.  Alleged Discrimination

FASORP alleges that, over the last twelve years, the leadership of Northwestern Law has implemented and enforced a discriminatory "hiring mandate" to "intentionally and consciously discriminate in favor of black, Hispanic, Asian, female, homosexual, and transgender faculty candidates, and against white men who are heterosexual and non-transgender." *Id.* ¶ 12. This mandate allegedly resulted in Northwestern Law "refus[ing] to even consider hiring white male faculty candidates with stellar credentials, while it eagerly hires candidates with mediocre and undistinguished records who check the proper diversity boxes." *Id.* ¶ 14. FASORP further alleges that Northwestern Law "doubled down on its racial preferences for black faculty candidates after the death of George Floyd in 2020, in response to pressure from students who complained that black faculty were insufficiently represented." *Id.* ¶ 40. On June 12, 2020, the dean of Northwestern Law issued a letter discussing the school's "Commitment to Anti-Racism," writing:

> Hiring more Black faculty and faculty of color—and retaining and promoting those faculty members—is a top priority for me. We need to build a faculty that is reflective of our student body and the Law School's diverse ideals. I am pleased that both of our faculty hires this past year, Paul Gowder, who will join our tenure-line faculty, and Robin Walker Sterling, who will join our faculty as the Mayer Brown/Robert A. Helman Professor of Law and director of the Bluhm Legal Clinic, will help further this goal. This is only

4

> a start.  In addition to recruiting diverse full-time hires, we will
> prioritize this through visiting faculty and adjunct hires.

*Id.* ¶ 41 (citing Doc. 1-4 at 2).

According to FASORP, the appointments committee perpetuates this "regime of illegal race and sex preferences."  *Id.* ¶ 45.  The deans allegedly "ensure that faculty members who are known to oppose discriminatory race and sex preferences are never selected for the appointments committee."  *Id.*  As a result, the appointments committee "makes sure that white men are blocked from further consideration at the committee stage, so that the faculty has no chance to vote on them."  *Id.* ¶ 46.  At the same time, however, FASORP alleges that the appointments committee "of course . . . will occasionally allow some white men to proceed to the interview stage, because if the committee never allowed any white men to interview then that would create a strong inference of discriminatory motive."  *Id.* ¶ 47.  And of those who proceed to the interview stage, FASORP alleges that "white men . . . are never hired unless they are in a high-demand and low-supply field (such as tax or empirical work), where it is difficult or impossible to find female or minority scholars."  *Id.*

FASORP provides examples of Northwestern Law leadership allegedly perpetuating this discrimination in various ways.  To start, they discuss three candidates whom Northwestern Law allegedly refused to consider for faculty appointments.  Eugene Volokh "is a prolific and internationally renowned legal scholar" who allegedly expressed interest in a faculty appointment at Northwestern Law during the 2022–2023 academic year.  *Id.* ¶ 15.  Although many members of Northwestern Law's faculty supported Volokh's appointment, Defendant Rodriguez allegedly "refused to even invite Professor Volokh to interview" because he "is a white man, and he is neither homosexual nor transgender."  *Id.* ¶¶ 15–17.  Similarly, FASORP alleges that the appointments committee recommended Ilan Wurman for a tenure-track

appointment during the 2019–2020 hiring cycle, but Defendant Lawsky "expressly stated at a faculty meeting that she opposed Wurman's appointment to the faculty because he is a white man." *Id.* ¶ 20. Two other professors, including Defendant Nadler, also allegedly opposed Wurman's appointment because they wanted "to hire women and nonwhites rather than white men." *Id.* Finally, FASORP alleges that Ernie Young is "another famous and distinguished legal scholar whom Northwestern refused to hire because he is a white man." *Id.* ¶ 18. The complaint does not include any allegations regarding when or how he applied for a faculty appointment at Northwestern Law.

FASORP also alleges that Northwestern Law's discriminatory "hiring mandate has led to the hiring of patently unqualified professors." *Id.* ¶ 21. First, it alleges that Destiny Peery was "unqualified for an academic appointment and incapable of producing serious scholarship," *id.*, but she nevertheless was hired in 2014 as a tenure-track professor. According to FASORP, Defendant Rodriguez "threatened to withhold bonuses from any faculty member who would vote against Peery or attempt to thwart her appointment." *Id.* ¶ 22. Further, FASORP states that "Peery was hired because she is a black female, as numerous faculty members explicitly stated when discussing her candidacy." *Id.* ¶ 23. Second, in 2015, Northwestern Law hired Candice Player, who FASORP describes as "another unqualified black woman." *Id.* ¶ 34. According to FASORP, Defendant Rodriguez again "ramrodded Player's appointment through the faculty by threatening to withhold bonuses from any professor who had the temerity to question the wisdom or legality of the appointment." *Id.* ¶ 36. Player was allegedly "hired over white male candidates who were vastly more capable and qualified than she was." *Id.* Third, during the 2019–2020 academic year, Defendant Yuracko wanted to hire Paul Gowder and Heidi Kitrosser. FASORP alleges that she "offered a bargain" to Professor Calabresi, a conservative member of

the lateral-appointments committee. *Id.* ¶ 38. Defendant Yuracko allegedly "told Calabresi that if he would support the lateral appointments of Gowder and Kitrosser . . . then Yuracko would support an entry-level appointment for Ilan Wurman, a Federalist Society member supported by Professor Calabresi." *Id.* Defendants Yuracko and Lawsky allegedly then "torpedoed" the appointment of Wurman, because they "did not want a white male." *Id.* ¶ 39. Fourth, Northwestern Law hired Jamelia Morgan, a black woman, as a professor in 2022, even though she was "only in her fourth year of teaching, barely tenured," and "had no competing offers from any schools ranked higher than Northwestern." *Id.* ¶ 42. Finally, Northwestern Law extended an offer in 2024 to Myriam Gilles, "a black law professor at Cardozo Law School." *Id.* ¶ 44. According to FASORP, "[i]t was made clear to the Northwestern faculty that the law school had to hire a black woman for this position, and that if they did not vote to approve the appointment of Gilles then the law school would have to hire a black woman later who would almost certainly be worse." *Id.* FASORP also alleges that Northwestern Law hired Gilles despite her past plagiarism.

The complaint also provides data regarding "how Northwestern has conducted its interviews and hiring decisions over the last three academic years." *Id.* ¶ 48. In particular, they identify the number of candidates who received interviews and/or offers during each hiring cycle and compare the number of offers provided to white men with offers made to anyone other than white men. They allege that Northwestern Law gave offers to (1) six candidates during the 2023–2024 hiring cycle, none of whom were white men; (2) nine candidates during the 2022–2023 cycle, one of whom was a white man; and (3) six candidates during the 2021–2022 cycle, two of whom were white men.[3] To more clearly illustrate this data, Tables 1 and 2 further

---

[3] FASORP alleges that Northwestern Law gave offers to two of these white men because their expertise is in fields where "it is very difficult to find female or minority scholars." Doc. 1 ¶¶ 49–50. FASORP

compare the number of candidates who received interviews and/or offers during each hiring cycle:

### Table 1.  Race/Ethnicity of Candidates

|  | White | Black | Asian | Latino/ Hispanic | Not Specified |
|---|---|---|---|---|---|
| **2023–2024 Hiring Cycle** | | | | | |
| **Interviewed** | 4 | 4 | 3 | 1 | 4 |
| **Offer Made** | 1 | 2 | 1 | 0 | 2 |
| **2022–2023 Hiring Cycle** | | | | | |
| **Interviewed** | 12 | 3 | 4 | 2 | 0 |
| **Offer Made** | 5 | 1 | 2 | 1 | 0 |
| **2021–2022 Hiring Cycle** | | | | | |
| **Interviewed** | 7 | 7 | 2 | 1 | 0 |
| **Offer Made** | 4 | 1 | 1 | 0 | 0 |
| **Total** | | | | | |
| **Interviewed** | 23 | 14 | 9 | 4 | 4 |
| **Offer Made** | 10 | 4 | 4 | 1 | 2 |

### Table 2.  Sex/Gender of Candidates

|  | Male | Female | Non-Binary |
|---|---|---|---|
| **2023–2024 Hiring Cycle** | | | |
| **Interviewed** | 8 | 7 | 1 |
| **Offer Made** | 2 | 3 | 1 |
| **2022–2023 Hiring Cycle** | | | |
| **Interviewed** | 11 | 10 | 0 |
| **Offer Made** | 4 | 5 | 0 |
| **2021–2022 Hiring Cycle** | | | |
| **Interviewed** | 6 | 11 | 0 |
| **Offer Made** | 2 | 4 | 0 |
| **Total** | | | |
| **Interviewed** | 25 | 28 | 1 |
| **Offer Made** | 8 | 12 | 1 |

---

further alleges that the offer given to the other white man "was a sham" because the candidate had already received another offer from the University of Chicago and there was "zero chance" that the candidate would accept Northwestern Law's offer.  Northwestern Law allegedly "extended him an offer for the sole purpose of making their policy of discriminating against white men seem somewhat less obvious to someone who simply examines the numbers."  *Id.* ¶ 49.

II.     **Northwestern Law Review**

A.     **General Overview of Member, Editor, and Article Selection Process**

The complaint includes very few details about NLR's member, editor, and article

selection processes.  With respect to NLR's member and editor selection process, NLR allegedly

solicits personal statements from student applicants "[r]ather than choosing its members based on

law-school grades and a blind-graded writing competition."  *Id.* ¶ 82.  FASORP alleges that

"[s]tudents are encouraged to use these personal statements to signal their race, sexual

orientation, and gender identity," *id.*, but the complaint is silent as to who encourages students to

disclose this information and whether the students actually disclose this information.  FASORP

further alleges that, "a student applicant who is female, a racial minority, or homosexual or

transgender and who uses those demographic characteristics to claim that they have overcome

adversity or will bring a unique perspective to the law review will be awarded a significant boost

in the membership-selection process," whereas "a white male applicant who is neither

homosexual nor transgender will never be awarded any type of preference based on their

personal statement, even if they claim to have overcome adversity or assert that they will bring a

unique perspective to the law review."  *Id.* ¶ 83.

The allegations regarding the article selection process are even more sparse.  The

complaint alleges that there is a "normal selection process" through which "authors earn[] their

placement in the Northwestern University Law Review by writing better scholarship than the

articles that were rejected," *id.* ¶ 86, but it includes no further details regarding this process.

B.     **Alleged Discrimination**

NLR's website states that it "does not discriminate on the basis of race, ethnicity,

religion, socioeconomic background, disability, nationality, sexual orientation, gender

orientation and identity, or ideological perspective." *Id.* ¶ 82 (citation omitted). However, FASORP alleges that this is a "bald-faced lie" because NLR's student editors "give discriminatory preferences to women, racial minorities, homosexuals, and transgender people when selecting their members and editors." *Id.* ¶¶ 81–82. FASORP further alleges that NLR's student editors "give discriminatory preferences to articles written by women, racial minorities, homosexuals, or transgender people, while rejecting far better articles written by white men." *Id.*

To support these claims of discrimination, FASORP first alleges that NLR "established a position on its editorial board for a 'senior equity and inclusion editor.'" *Id.* ¶ 84. FASORP alleges that this position is meant "to ensure that women, racial minorities, and homosexual and transgender individuals are given illegal discriminatory preferences over white heterosexual and non-transgender men, both with respect to the selection of student members and editors as well as the selection of articles." *Id.* FASORP does not include any detailed factual allegations regarding this position. For example, it is unclear to what extent this editor is involved in the member, editor, and article selection processes or how they ensure that NLR gives certain applicants discriminatory preferences, as FASORP claims. And FASORP's allegation that this editor "oversees and encourages [NLR's] violations of federal anti-discrimination laws" is seemingly inconsistent with its allegation that this editor "repeatedly confirmed" NLR's "compliance with all applicable law" during discussions with Northwestern's general counsel. *Id.* ¶¶ 90, 102. To reconcile this contradiction, FASORP speculates that "[t]here would be no need for the Law Review to consult with the university's general counsel if it were using colorblind and sex-neutral selection practices" and "there would be no need to involve the 'senior equity and inclusion editor' in these discussions unless the Law Review was seeking validation for its discriminatory race and sex preferences." *Id.* ¶ 90.

10

FASORP also supports its allegations of discrimination by pointing to the non-disclosure agreements ("NDAs") that NLR asks its members to sign. FASORP alleges that these are meant to "prevent[] [NLR's members] from exposing the race and sex preferences that the Law Review uses when selecting its articles, editors, and members." *Id.* ¶ 88. FASORP attached a 2023 NDA as an exhibit to the complaint, which specifies that it is meant to "prevent[] the unauthorized disclosure of Confidential Information," including Write-On submissions, scoring rubrics, and scores; student grade-point averages; and "debates related to the selection of the *Northwestern University Law Review* Volume 118 membership." Doc. 1-6 at 1. FASORP further alleges that, "[w]hen FASORP initially used [sic] Northwestern over its illegal race and sex preferences in July of 2022," NLR "sent a missive" reminding its members of their obligations under the NDAs and instructed them to use discretion in written communication. Doc. 1 ¶ 88. FASORP concludes that this "would not be necessary if the Law Review were selecting its articles, editors, and members in a colorblind and sex-neutral fashion." *Id.* ¶ 89. FASORP attached this communication to the complaint as an exhibit. Doc. 1-5.

FASORP also includes two discrete examples of this alleged discrimination at play. Regarding the member and editor selection process, FASORP alleges that NLR "rejected an application from a white male student" in 2021 "who had a first-year grade point average of over 4.0, while accepting female and minority students with much lower first-year grades." *Id.* ¶ 85. And regarding the article selection process, FASORP alleges that NLR's Issue 3 of Volume 118 consisted "only of articles written by black women." *Id.* ¶ 86. FASORP alleges that the editors decided to do this intentionally to "promote the careers of these black women academics because of their race and sex." *Id.* ¶ 86. One of the articles allegedly "contains numerous instances of plagiarism," and FASORP concludes from this that NLR "would prefer to publish articles with

11

plagiarism (and articles written by serial plagiarists) as long as the authors are black women, rather than publish scholarship from members of other demographics who respect and follow the requirements of academic integrity." *Id.* ¶ 87.

## III. Allegations Regarding Standing

FASORP alleges that it "has members who are ready and able to apply for entry-level and lateral faculty positions at Northwestern University's law school," as well as "members who have submitted articles to the Northwestern University Law Review, who are ready and able to submit articles to the Northwestern University Law Review, and who intend to submit their future scholarship to the Northwestern University Law Review." *Id.* ¶ 104. Specifically, the complaint identifies three FASORP members, all of whom are heterosexual, cisgender white men who currently work as tenured or tenure-track law professors at ABA-accredited law schools. Given their current positions as law professors, they are eligible to apply to Northwestern Law only as lateral candidates.

First, Individual A is a tenure-track law professor at an ABA-accredited law school with a J.D. and a Ph.D. in political science. He has published over fifteen scholarly articles and one book. He previously applied for a tenure-track position as an entry-level candidate at Northwestern Law when he submitted his application to the Faculty Appointments Register. He has since informed "at least one person on Northwestern's law faculty of [his] interest in a lateral faculty appointment," and intends to "continue doing so each year until [he] receive[s] a faculty appointment at Northwestern." *Id.* ¶ 113. Individual A has also submitted at least one manuscript to NLR, which NLR rejected. At the time the complaint was filed, he was working on another article that he intended to submit to NLR in either February or August 2025.

Next, Individual B is a tenured law professor at an ABA-accredited law school with "more than 20 years of experience as a scholar and teacher." *Id.* ¶ 115. He has published over thirty scholarly articles and has served as a visiting professor at a "top-five law school." *Id.* He has also submitted several previous manuscripts to NLR, but the "vast majority" were rejected. *Id.* ¶ 120. At the time the complaint was filed, he was working on another article that he intended to submit to NLR in either February or August 2025.

Finally, Individual C is also a tenured law professor at an ABA-accredited law school with "more than 20 years of experience as a scholar and teacher." *Id.* ¶ 116. He has published over fifty scholarly articles or book chapters and one book, and he has also served as a visiting professor at a "top-five law school." *Id.* Similarly to Individual A, Individual C has informed "at least one person on Northwestern's law faculty of [his] interest in a lateral faculty appointment," and intends to "continue doing so each year until [he] receive[s] a faculty appointment at Northwestern." *Id.* ¶ 113. Individual C has also submitted at least seven manuscripts to NLR, all of which were rejected. At the time the complaint was filed, he was working on two articles which he intended to submit to NLR in either August 2025 or February 2026.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(1) challenges the Court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The standard of review for a Rule 12(b)(1) motion to dismiss depends on whether the defendant raises a facial or factual challenge. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). If, as here, a defendant challenges the sufficiency of the allegations regarding subject matter jurisdiction—a facial challenge—the Court "must accept all well-pleaded factual allegations as true and draw all reasonable inferences" in the plaintiff's

13

favor. *Id.* "[W]hen evaluating a facial challenge to subject matter jurisdiction," the Court employs the *Twombly–Iqbal* "plausibility" standard, "which is the same standard used to evaluate facial challenges to claims under Rule 12(b)(6)." *Id.* at 174.

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

### I. Article III Standing

The Court starts with Article III standing, which "is a threshold question in every federal case because if the litigants do not have standing to raise their claims the court is without authority to consider the merits of the action." *Meyers v. Nicolet Rest. of De Pere, LLC*, 843 F.3d 724, 726 (7th Cir. 2016) (quoting *Freedom from Religion Found., Inc. v. Zielke*, 845 F.2d 1463, 1467 (7th Cir. 1988)).

FASORP invokes associational standing, which permits an organization to sue on behalf of its members "even without a showing of injury to the association itself." *Prairie Rivers*

*Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1008 (7th Cir. 2021) (quoting

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552 (1996)).

FASORP therefore must establish that "(1) at least one of its members would 'have standing to

sue in their own right'; (2) 'the interests it seeks to protect are germane to the organization's

purpose'; and (3) 'neither the claim asserted nor the relief requested requires the participation of

individual members.'" *Id.* (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333,

343 (1977)).

Defendants do not dispute that FASORP satisfies the second and third elements and

instead focus their arguments only on the first element, which requires FASORP to establish that

one or more of its members "have suffered a concrete injury-in-fact that would support

individual Article III standing." *Ill. Nurses Ass'n v. Rosenblatt*, No. 24 CV 12379, 2025 WL

2430571, at *3 (N.D. Ill. Aug. 22, 2025) (citing *Milwaukee Police Ass'n v. Flynn*, 863 F.3d 636,

639 (7th Cir. 2017)).  Specifically, FASORP must plausibly allege that it has at least one

member who "(1) suffered an [actual or imminently threatened] injury in fact, (2) that is fairly

traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a

favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v.*

*Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  At the pleading stage, the plaintiff must plead

"concrete facts" to show a substantial risk of harm, and "cannot rely on speculation about 'the

unfettered choices made by independent actors not before the courts.'" *Clapper v. Amnesty Int'l*

*USA*, 568 U.S. 398, 414 n.5 (2013) (quoting *Lujan*, 504 U.S. at 562).  And to the extent that the

alleged injury in fact is a threatened injury, rather than an actual injury, it must be "certainly

impeding," and "allegations of *possible* future injury are not sufficient."  *Id.* at 409, 414 n.5

(citations omitted) (internal quotation marks omitted).

Further, because FASORP is seeking injunctive and declaratory relief, it must also show a likelihood of future harm, meaning "a real and immediate threat of repeated injury." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). FASORP must demonstrate standing with respect to each form of relief sought. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) (citing *Lyons*, 461 U.S. at 109).

### A. Northwestern Law's Faculty Hiring Processes

FASORP first seeks to challenge Northwestern Law's entry-level and lateral faculty hiring processes. FASORP can "establish standing to challenge [a] hiring process . . . by showing that" at least one of its members "would have been 'able and ready' to apply for" the position in the reasonably foreseeable future. *Tarpley v. Jeffers*, 96 F.3d 921, 924 (7th Cir. 1996); *see also Carney v. Adams*, 592 U.S. 53, 63 (2020) (holding that plaintiff lacked standing because he was not "able and ready" to apply for the position "in the reasonably foreseeable future"). Defendants argue that FASORP lacks standing to challenge either of Northwestern Law's faculty hiring process because it has not adequately alleged that any of its members are ready and able to apply for entry-level or lateral faculty positions.

Starting with the lateral faculty hiring process, the Court concludes that FASORP has pleaded sufficient facts to establish standing at this stage of the case. FASORP alleges that at least two of its members, Individuals A and C, have "already informed at least one person on Northwestern's law faculty of their interest in a lateral faculty appointment," which is how lateral candidates typically apply for law-school faculty appointments. Doc. 1 ¶ 113. These members allegedly intend to continue applying in this way each year until they receive a faculty appointment. FASORP further alleges that these members are eligible to apply as lateral candidates, given their current positions as law professors at ABA-accredited law schools and

16

other qualifications.  Finally, they allege that Individuals A and C will face discrimination when they apply, supporting this with allegations that Defendants and other Northwestern Law faculty have discriminated against specific faculty applicants due to their race or gender in the past. These allegations are sufficient to establish associational standing.

Defendants' arguments to the contrary are unpersuasive because they seek to impose a higher standard than that required at the pleading stage.  For example, they argue that FASORP fails to allege to "whom or in what manner [Individuals A and C] expressed [their] interest" in a faculty appointment or whether they "asked, let alone convinced, any faculty member to intercede with the appointments committee." Doc. 27 at 9–10.  They further argue that FASORP failed to provide detailed information about Individuals A, B, and C's qualifications, such as their areas of expertise, academic records, class rankings, and whether other law schools have offered them lateral positions.  Notably, however, none of the cited caselaw holds that this granular level of detail is necessary at the pleading stage.  And this is unsurprising because the Supreme Court has confirmed that, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice" to establish standing, "for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan*, 504 U.S. at 561.

Further, the prior cases dismissing similar claims brought by FASORP for lack of Article III standing are clearly distinguishable.  In both prior cases, the courts dismissed the hiring claims because the complaints did not identify any specific FASORP members who had standing in their own right. *FASORP v. Harv. L. Rev. Ass'n*, No. CV 18-12105, 2019 WL 3754023, at *5–6 (D. Mass. Aug. 8, 2019) ("Nowhere, however, does the Amended Complaint 'identify'—in any sense of that word—a member of either plaintiff association, let alone one who has suffered

17

or will suffer the requisite injury."); *FASORP v. N.Y.U. L. Rev.*, No. 18 CIV 9184, 2020 WL

1529311, at *5 (S.D.N.Y. Mar. 31, 2020) ("*N.Y.U. I*") ("[I]t is clear that a plaintiff association

must at minimum, identify one injured member with specific allegations, which FASORP fails to

do."), *aff'd sub nom. Fac. v. N.Y.U.*, 11 F.4th 68 (2d Cir. 2021) ("*N.Y.U. II*"). Here, in

comparison, the complaint identifies three specific members—Individuals A, B, and C—and

includes specific factual allegations regarding their readiness and ability to apply for a lateral

faculty position at Northwestern Law.

      Defendants also cite *Lowery v. Texas A&M University*, No. 23-20481, 2024 WL 4614714

(5th Cir. Oct. 30, 2024), but this case is likewise distinguishable. In *Lowery*, the Fifth Circuit

dismissed similar claims brought by a professor who alleged that he was able and ready to apply

for a lateral faculty position at Texas A&M University. *Id.* at *1. The court concluded that he

lacked standing because he "never submitted an application to substantiate his interest." *Id.*

That is not the case here. Although Individuals A and C did not submit a formal application,

FASORP alleges that lateral faculty candidates "do not submit documents or go through a

formalized [application] process" and instead apply by "inform[ing] friends or acquaintances on

the faculty of their interest in seeking a position." Doc. 1 ¶ 113. FASORP therefore alleges that

Individuals A and C essentially applied to the positions by "inform[ing] at least one person on

Northwestern's law faculty of their interest in a lateral faculty appointment." *Id.* The Court

presumes these factual allegations to be true at this stage of the case, and *Lowery* is thus

inapposite.

      That said, while Individuals A and C have standing to challenge the lateral hiring process,

it does not follow that they necessarily have standing to challenge the entry-level hiring process.

While FASORP argues that it "is not bringing separate challenges to Northwestern's entry-level

and lateral hiring," Doc. 33 at 8 n.19, the complaint is clear that these are two distinct processes. And FASORP is seeking relief that would apply to both the lateral and entry-level hiring processes. *See* Doc. 33 at 8 n.19 ("[FASORP] is seeking relief that would bar Northwestern from awarding discriminatory preferences to women, racial minorities, homosexuals, or transgender people in *any* of its faculty-hiring decisions." (citing Doc. 1 ¶ 161)). FASORP must demonstrate standing with respect to each form of relief sought, *Friends of the Earth*, 528 U.S. at 185, yet it fails to identify any member who is ready and able to apply for an entry-level faculty position at Northwestern Law. To the contrary, it admits that Individuals A, B, and C are not even eligible to apply as entry level applicants. Therefore, with respect to the entry-level hiring process, FASORP has not sufficiently alleged that it has associational standing.

### B. Northwestern Law Review's Member and Editor Selection Process

FASORP also seeks to challenge NLR's member and editor selection processes. Defendants argue that FASORP lacks associational standing to challenge this process because it does not allege that one or more of its members are students at Northwestern Law who intend to apply for a member or editor position. FASORP does not dispute that its membership does not include any students who applied or intend to apply to become a NLR member or editor. Instead, FASORP argues that NLR's member and editor selection practices will "inflict[] injury in fact" on Individuals A, B, and C when they submit manuscripts to NLR for consideration. Doc. 1 ¶ 118. This is because, according to FASORP, NLR's selection practices result in Individuals A, B, and C's submissions being "judged by students with lower academic credentials and abilities." *Id.* FASORP further alleges that this selection process inflicts injury in fact on Individuals A, B, and C because "students whose membership on the law review is

attributable to race and sex preferences are more likely to discriminate against articles written by white, heterosexual men." *Id.*

The Court agrees with Defendants that these allegations are not sufficient to establish associational standing. Rather than establishing a certainly impending injury or substantial risk of harm to one of its' members, FASORP's allegations amount to nothing more than conjecture about what *might* happen in the future. As another district court analyzing this same issue explained:

> Even taking every reasonable inference in FASORP's favor, the amended complaint shows that FASORP's alleged threatened injury–being subject to discriminatory treatment–would only take place if: (1) a faculty member of FASORP authors a legal article at some point in the future; (2) that member submits that article to the Law Review; (3) the Law Review members are indeed composed of students that had chosen to identify their race and gender as noteworthy characteristics in their personal statements or resumes, and had received preferential treatments as a result thereof; (4) those students are 'less capable' than students selected only on the basis of grades and other diversity factors; (5) the faculty member of FASORP volunteers his race and gender information, which the Law Review then uses to either give less weight to or reject his article; and (5) if those articles are accepted for publication, the Law Review would staff those "less capable" students as editors on those articles. Such a "highly attenuated chain of possibilities" cannot support standing, as a plaintiff cannot "manufacture standing merely by inflicting harm on [its] fear of hypothetical future harm that is not certainly impending."

*N.Y.U. I*, 2020 WL 1529311, at *6 (alteration in original) (citation omitted).

The same is true here. The complaint alleges that students "are encouraged" to disclose information regarding their race, sex, gender, and/or sexual orientation in their personal statements. It is silent, however, as to whether applicants actually disclose this information and, if so, how many applicants disclose this information. Additionally, the complaint lacks the factual allegations necessary to support its conclusory assertion that NLR editors discriminate against heterosexual, cisgender white men when selecting members and editors. At most,

20

FASORP alleges that NLR (1) rejected one white male with an over 4.0 grade point average in 2021, (2) established a position on its editorial board for a senior equity and inclusion editor, and (3) asks its members to sign NDAs and use discretion in written communications regarding the selection process. The Court cannot plausibly infer from these allegations alone that NLR's review editors generally discriminate during the member and editor selection process, particularly considering NLR's expressly stated anti-discrimination policy. *See Doe v. N.Y.U.*, No. 23-CV-10515, 2024 WL 2847368, at *4 (S.D.N.Y. May 30, 2024) (analyzing similar allegations and concluding that "[e]ven if I were to indulge Doe's belief that some students will reveal this information in their application, it is a speculative leap to conclude that the Law Review is flouting its own facially neutral policy for selecting new editors and instead impermissibly relying on the sex, gender, race, or sexuality of applicants").

Even if FASORP had plausibly alleged that NLR's member and editor selection process is discriminatory, however, FASORP would still lack standing because it has not established that at least one of its members faces a certainly impending injury because of this process. While FASORP alleges that the unknown number of "students whose membership on the law review is attributable to race and sex preferences are *more likely* to discriminate against articles written by" Individuals A, B, and C, Doc. 1 ¶ 118 (emphasis added), this does nothing to establish a certainly impeding injury. The law is clear that "fears of hypothetical future harm" or "speculation about 'unfettered choices made by independent actors' [are] too attenuated" to establish standing. *Maly v. Ill. State Bd. of Elections*, No. 24-2979, 2025 WL 3493943, at *2 (7th Cir. Dec. 5, 2025) (quoting *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024)).

FASORP also argues that Individuals A, B, and C will suffer injury in fact from NLR's editor and member selection process because they will have their submissions judged by less qualified members and editors. However, the Court cannot agree that this is an injury in fact, meaning an "invasion of a legally protected interest." *Lujan*, 504 U.S. at 555. As other courts analyzing this issue have concluded, FASORP's members "have suffered no injury in fact from the Law Review's membership and articles selection process because there is no legally protected interest in having one's academic work evaluated by the most 'capable' students." *N.Y.U. I*, 2020 WL 1529311, at *6; *see also Harv. L. Rev.*, 2019 WL 3754023, at *7 ("Authors who believe that their submissions to HLRA are judged and edited by less capable students as a result of the member-selection policy lack standing to challenge that policy on behalf of the students directly impacted by it."). And while FASORP attempts to analogize this injury to the injury alleged in *Powers v. Ohio*, 499 U.S. 400 (1991), this argument fails. *Powers* held that a criminal defendant had standing to challenge a discriminatory jury selection process because racial discrimination during the jury selection process is "a constitutional violation committed in open court," which undermines "[t]he purpose of the jury system." *Id.* at 412–13. Those considerations are not present in this case. *See N.Y.U. I*, 2020 WL 1529311, at *6 (distinguishing *Powers* because "unlike a criminal defendant's constitutional right to a fair trial and hence a fairly selected jury, there is no legal right to have one's article reviewed or published by a student-run academic law journal"); *see also N.Y.U. II*, 11 F.4th at 77 ("*Powers* depended on special considerations relating to criminal justice that are inapplicable here").

Therefore, the Court concludes that FASORP does not have standing to challenge NLR's member or editor selection process.

### C.     Northwestern Law Review's Article Selection Process

FASORP also challenges NLR's article selection process, alleging that this process inflicts injury in fact on Individuals A, B, and C because it prevents them "from competing with other authors who submit articles to the law review on an equal basis."  Doc. 1 ¶ 117.  Many of the allegations supporting this theory overlap with the allegations supporting the member and editor selection theory.  FASORP again alleges that NLR established a position on its editorial board for a senior equity and inclusion editor and asks its members to sign NDAs regarding the selection process.  Additionally, FASORP alleges that NLR published Issue 3 of Volume 118 and intentionally chose to include only articles written by black women.

As with the member and editor selection process, it is a "speculative leap" to conclude, based on these allegations alone, that NLR is violating its express anti-discrimination policy and discriminating against straight, white men during the article selection process.  *Doe*, 2024 WL 2847368, at *4.  FASORP does not allege, for example, that the authors disclose their race or gender when submitting articles for review.  Nor does it provide any allegations regarding the selection process itself.  And without any allegations to plausibly support an inference of current discrimination, the allegation that NLR previously published a single issue consisting of articles written only by black women does not, in it of itself, confer standing for injunctive relief.  *See LaRosa ex rel. LaRosa v. Walgreen Co.*, No. 12 C 932, 2012 WL 2526661, at *3 (N.D. Ill. June 29, 2012) (holding that allegations of past discrimination are insufficient to demonstrate standing for injunctive relief); *Perry L. v. Milwaukee Montessori Sch.*, No. 22-CV-1244, 2025 WL 1191025, at *3 (E.D. Wis. Apr. 24, 2025) ("Plaintiffs cannot base their standing to sue for injunctive relief on allegations of past discrimination by Milwaukee Montessori.").

For these reasons, the Court concludes that FASORP does not have standing to challenge NLR's article selection process.

### D.    Other Relief[4]

Finally, FASORP seemingly challenges Northwestern Law's faculty promotion, retention, discipline, and compensation practices.  *See* Doc. 1 ¶ 161 (requesting that the Court (1) "permanently enjoin" Defendants "from considering race, sex, sexual orientation, or gender identity in the appointment, promotion, retention, or compensation of its faculty" and (2) "appoint a court monitor to oversee all decisions relating to the appointment, promotion, and compensation of faculty"); *see also id.* ¶ 30 (alleging that Northwestern Law promoted Peery because "Nadler wanted a black female promoted to associate professor despite Peery's failure to produce adequate scholarship"); *id.* ¶ 78 (alleging that Northwestern Law refused to "impos[e] any sanctions or corrective measures" on a black female professor for alleged plagiarism). FASORP does not identify any members who would have standing to sue in their own right regarding these policies or practices.  It does not even allege that any of its members are faculty at Northwestern Law, let alone faculty who have been or will be harmed by Northwestern Law's faculty promotion, retention, discipline, or compensation practices.  The Court therefore concludes that FASORP does not have associational standing to challenge Northwestern Law's promotion, retention, discipline, or compensation of its faculty.

## II.    Failure to State a Claim

Defendants also argue that the Court should dismiss FASORP's claims pursuant to Rule 12(b)(6).  Because FASORP lacks standing to challenge the entry-level faculty hiring process, NLR's selection processes, or the faculty promotion, retention, discipline, and compensation

---

[4] Defendants do not challenge FASORP's standing to seek this relief, but "[w]hen a requirement goes to subject-matter jurisdiction, courts are obligated to consider *sua sponte* issues that the parties have disclaimed or have not presented."  *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012).

practices, the Court analyzes only whether FASORP has sufficiently stated claims based on Northwestern Law's lateral faculty hiring process.[5]

A.      Title VI Claim

FASORP first asserts a Title VI claim, alleging that Defendants discriminate "in favor of racial minorities and against whites" during Northwestern Law's lateral faculty hiring process. Doc. 1 ¶ 140.  Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of or be subjected to discrimination under any program or activity receiving federal financial assistance." 42 U.S.C. § 2000d.

The Court agrees with Defendants that FASORP cannot maintain a Title VI employment discrimination claim based on the allegations in the complaint.  The Seventh Circuit has made clear that "Title VI does not provide a judicial remedy for employment discrimination by institutions receiving federal funds unless (1) providing employment is a primary objective of the federal aid, or (2) discrimination in employment necessarily causes discrimination against the primary beneficiaries of the federal aid."  *Ahern v. Bd. of Educ.*, 133 F.3d 975, 978 (7th Cir. 1998) (citation omitted).  The Court addresses each of these potential exceptions in turn.

Starting with the first *Ahern* exception, FASORP has fallen far short of establishing that any of Northwestern's federal funding has a primary objective of providing employment.  At most, the complaint alleges generally that the federal government provides "research grants . . . to institutions such as Northwestern" that are "used to employ university faculty on research

---

[5] The Court acknowledges FASORP's request for the Court to "conditionally rule on the defendants' Rule 12(b)(6) motion even if it decides to dismiss under Rule 12(b)(1) for lack of subject-matter jurisdiction." Doc. 33 at 17 n.34.  However, the Court declines to do so, as "a court may not presume hypothetical jurisdiction in order to decide a question on the merits."  *Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561, 573 (7th Cir. 2012); *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 101 (1998) ("Hypothetical jurisdiction produces nothing more than a hypothetical judgment—which comes to the same thing as an advisory opinion, disapproved by this Court from the beginning.").

tasks that the federal government wishes to fund." Doc. 1 ¶ 134. Even if the Court were to infer from these sparse allegations that (1) Northwestern itself receives such research grants and (2) Northwestern uses those grants to employ law faculty, it still cannot conclude that the first *Ahern* exception applies. The mere fact that federal funds support employment does not, in and of itself, establish that employment is the *primary objective* of that funding. *See, e.g.*, *Rosas v. Bd. of Educ.*, No. 19-CV-2778, 2025 WL 2712293, at *11 n.12 (N.D. Ill. Sept. 23, 2025) ("[T]he fact that an educational institution puts federal funds towards teacher salaries does not on its own establish that the primary objective of those funds are employment."); *Cieslik v. Bd. of Educ.*, No. 1:19-CV-05553, 2021 WL 1172575, at *3 (N.D. Ill. Mar. 29, 2021) (holding that the primary objective of federal funding was "to educate *students*," even though it was also "used to support instruction and to pay instructional salaries");[6] *Veljkovic v. Bd. of Educ.*, No. 20 C 1551, 2020 WL 7626735, at *3 (N.D. Ill. Dec. 22, 2020) (holding that the primary objective of the federal aid was "to educate students" and "employing teachers [was] only a means to that end").

In its response, FASORP argues that Northwestern specifically receives federal funding "from the National Science Foundation, the National Institutes for Health, and the National Endowment for the Humanities." Doc. 33 at 27; *see also* Doc. 33-2; Doc. 33-3; Doc. 33-4.[7]

---

[6] FASORP attempts to distinguish *Cieslik* by arguing that "it holds only that 'students . . . are the primary beneficiaries *of Title I funding*'" and "Northwestern University does not receive Title I money." Doc. 33 at 27 (citing *Cieslik*, 2021 WL 1172575, at *3). However, they fail to address the broader conclusion of *Cieslik* that a Title VI employment discrimination plaintiff must allege that "employment is the primary objective of [the] federal funding," and the mere fact that federal funding supports employment incidentally is not, in and of itself, enough. 2021 WL 1172575, at *3. FASORP cites no authority for the proposition that this conclusion applies *only* in the context of Title I funding.

[7] The Court can properly consider the allegations in FASORP's "response brief and attachments to the extent that they are consistent with the complaint." *Cole v. Ill. Dep't of Healthcare & Fam. Servs.*, No. 22-CV-3248, 2025 WL 965716, at *2 (C.D. Ill. Mar. 31, 2025) (citing *Heng v. Heavner, Beyers & Mihlar, LLC*, 849 F.3d 348, 354 (7th Cir. 2017)); *see also Help At Home Inc. v. Med. Cap., L.L.C.*, 260 F.3d 748, 752–53 (7th Cir. 2001) ("'A plaintiff need not put all of the essential facts in the complaint; he may add them by affidavit or brief in order to defeat a motion to dismiss if the facts are consistent with the allegations of the complaint.'").

26

While FASORP argues that these funds primarily benefit university faculty, none of the exhibits cited support this proposition. This is expected, given that the statutorily defined purposes of these agencies and the funding they provide is to support research, education, and/or scholarship, not employment. 42 U.S.C.A. § 1862 (authorizing the National Science Foundation "to initiate and support scientific and engineering research, including applied research, at academic and other nonprofit institutions"); 42 U.S.C. § 282(b)(7)(B) (authorizing the National Institutes of Health to allocate funds for the purposes of "conducting and supporting research"); 20 U.S.C. § 956(c)(1)–(10) (authorizing the National Endowment of Humanities to provide grants and loans for the purpose of supporting research, education, and scholarship "in the humanities"). Because employment is not the primary objective of this federal funding, the first *Ahern* exception does not apply. *See Cieslik*, 2021 WL 117257, at *3 (analyzing the "statutorily defined purpose" of federal funds to determine whether employment was the primary objective).

Nor does FASORP establish that the second *Ahern* exception applies in this case. While FASORP alleges that discrimination during the faculty hiring processes necessarily causes discrimination against the primary beneficiaries of federal aid, "as university faculty are 'primary beneficiaries' of federal research grants as well as the subsidized grants and loans that the federal government provides to university students," Doc. 1 ¶ 134, such conclusory allegations are insufficient to avoid dismissal. *See Twombly*, 550 U.S. at 545 (holding that a complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"). FASORP includes no factual allegations to support an inference that Northwestern Law faculty are the primary beneficiaries of these forms of federal aid; to the contrary, the complaint admits elsewhere that "students are the primary beneficiaries" of at least some of this funding. Doc. 1 ¶ 130.

Because neither *Ahern* exception applies in this case, FASORP cannot maintain its Title VI employment discrimination claim. The Court grants Defendants' motion to dismiss FASORP's Title VI claim and does not address Defendants' alternative arguments for dismissal.

### B.    Title IX Claim

FASORP also brings a Title IX claim against Defendants, alleging that they "are violating Title IX by discriminating in favor of female faculty candidates and against men" and "are also violating Title IX by discriminating in favor of homosexual or transgender faculty candidates and against faculty candidates who are heterosexual and identify and act in accordance with their biological sex." Doc. 1 ¶ 145. Defendants argue, and FASORP agrees, that this claim cannot proceed given the holding of *Waid*, 91 F.3d at 861–63. The Court therefore grants Defendants' motion to dismiss the Title IX claim.

### C.    Title VII Claim

FASORP also asserts a claim under Title VII, which makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Specifically, FASORP alleges that Defendants "are violating Title VII by discriminating in favor of females, racial minorities, homosexuals, and transgender persons and against white men who are neither heterosexual nor transgender in their faculty-hiring decisions." Doc. 1 ¶ 158.

Defendants understandably initially interpreted the complaint to be alleging a failure-to-hire Title VII claim. However, FASORP clarifies in its response that this is not the case. Instead, FASORP argues that it is alleging "an ongoing and future violation of Title VII simply

28

from the fact that its members will face a competitive disadvantage relative to female or minority faculty candidates when they apply for faculty positions at Northwestern, and that violation of Title VII remains no matter whom Northwestern ultimately decides (or decided) to hire." Doc. 33 at 33. Rather than supporting FASORP's position, however, this argument only serves to underscore the need for dismissal.

As Defendants correctly point out, regardless of the legal theory on which FASORP bases its Title VII claim, FASORP "'must show some harm respecting an identifiable term or condition of employment' to state a Title VII claim." Doc. 40 at 17 (quoting *Muldrow v. City of St. Louis*, 601 U.S. 346, 354–55 (2024)). This means that, to survive a motion to dismiss, a complaint asserting a Title VII discrimination claim must allege "that the employer instituted a (specified) adverse employment action against the plaintiff on the basis of" their membership in a protected class. *Shankle v. Vill. of Melrose Park*, No. 16 C 2582, 2018 WL 844422, at *2 (N.D. Ill. Feb. 12, 2018) (collecting cases); *see also Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008) ("[I]n order to prevent dismissal under Rule 12(b)(6), a complaint alleging . . . discrimination need only aver that the employer instituted a (specified) adverse employment action against the plaintiff on the basis of her [membership in a protected class]."). The Seventh Circuit has explained that this adverse employment action "must be a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits." *Lewis v. City of Chicago*, 496 F.3d 645, 653 (7th Cir. 2007)

Here, FASORP has not alleged that Northwestern instituted any adverse employment actions against any FASORP members. At most, FASORP alleges that Individuals A, B, and C will "face a competitive disadvantage" during the faculty hiring process. Doc. 33 at 33. This

29

alleged disadvantage, standing alone, is not an adverse employment action. FASORP does not allege that this disadvantage results in a significant change in employment status or benefits; to the contrary, it argues that the "violation of Title VII remains no matter whom Northwestern ultimately decides (or decided) to hire." *Id.* FASORP provides no authority to support this argument, and the Court will not ignore the binding Seventh Circuit precedent requiring plaintiff to allege an adverse employment action.

For this reason, the Court dismisses FASORP's Title VII claim.

### D.     Section 1981 Claim

Finally, FASORP asserts an employment discrimination claim under Section 1981, which "provides a federal remedy against racial discrimination in private employment." *McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 789–90 (7th Cir. 2019). Defendants argue that FASORP has failed to state a Section 1981 claim, and the Court agrees.

To survive a motion to dismiss, a Section 1981 plaintiff must "plead . . . that, but for race, it would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020). More specifically, "a plaintiff claiming employment discrimination under section 1981 must allege that her employer 'instituted a specific adverse employment action against' her because of her race." *Sanchez v. Tootsie Roll Indus., LLC*, No. 19-CV-4527, 2021 WL 4936240, at *5 (N.D. Ill. May 18, 2021). The causation requirement is "robust" even at the pleading stage. *Id.*

FASORP's claim fails from the start because, as explained in the previous section, FASORP does not allege that Defendants instituted or will institute any specific adverse employment actions against its members. FASORP also does not dispute that it failed to allege but-for causation. This is fatal, given the holding of *Comcast*, 589 U.S. at 341.

30

FASORP nonetheless argues that it need not allege but-for causation because it is seeking only forward-looking relief.  Specifically, FASORP believes that it "need only satisfy the four-part test for a permanent injunction" and sufficiently allege that the "request for declaratory relief satisfies Article III's case or controversy requirement by redressing an injury in fact."  Doc. 33 at 30–31.  This argument is baseless because Supreme Court precedent clearly holds that a plaintiff must initially plead but-for causation to state a Section 1981 claim.  *Comcast*, 589 U.S. at 341. Tellingly, FASORP cites no cases overruling or distinguishing this precedent, and instead relies on cases (1) holding that the prohibition against discrimination in Section 1981 is co-extensive with the Equal Protection Clause and (2) discussing the general standards for injunctive and declarative relief.  None of these cases even discuss the pleading standards for Section 1981 claims, nor do they hold that but-for causation is not required in Section 1981 cases seeking only forward-looking relief.

The Court therefore dismisses FASORP's Section 1981 claim and does not address Defendants' alternative arguments for dismissal.

### E.  Individual Defendants

Finally, Defendants ask the Court to dismiss the claims brought against the Individual Defendants, arguing that (1) these claims are redundant and (2) Title VI and Title IX claims can not be asserted against an individual defendant.  FASORP responds that it has "no quarrel" with this request, Doc. 33 at 17 n.35, and the Court therefore dismisses the claims asserted against the Individual Defendants.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss [27] and dismisses the complaint without prejudice.


Dated: January 22, 2026

_____
SARA L. ELLIS
United States District Judge